# O'CALLAHAN v. PARKER, WARDEN.

No. 646.   Argued January 23, 1969.—Decided June 2, 1969.

*Victor Rabinowitz* argued the cause and filed briefs for petitioner.

*James vanR. Springer* argued the cause for respondent. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Vinson, Beatrice Rosenberg,* and *Roger A. Pauley.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, then a sergeant in the United States Army, was stationed in July 1956, at Fort Shafter, Oahu, in the Territory of Hawaii. On the night of July 20, while on an evening pass, petitioner and a friend left the post dressed in civilian clothes and went into Honolulu. After a few beers in the bar of a hotel, petitioner entered the residential part of the hotel where

he broke into the room of a young girl and assaulted and attempted to rape her. While fleeing from her room onto Waikiki Beach, he was apprehended by a hotel security officer who delivered him to the Honolulu city police for questioning. After determining that he was a member of the Armed Forces, the city police delivered petitioner to the military police. After extensive interrogation, petitioner confessed and was placed in military confinement.

Petitioner was charged with attempted rape, housebreaking, and assault with intent to rape, in violation of Articles 80, 130, and 134 of the Uniform Code of Military Justice.[1] He was tried by court-martial, convicted on all counts, and given a sentence of 10 years' imprisonment at hard labor, forfeiture of all pay and

---

[1] Article 80 of the Uniform Code of Military Justice (10 U. S. C. § 880) provides in part:

"(a) An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense.

"(b) Any person subject to this chapter who attempts to commit any offense punishable by this chapter shall be punished as a court-martial may direct, unless otherwise specifically prescribed."

Article 130 (10 U. S. C. § 930) provides:

"Any person subject to this chapter who unlawfully enters the building or structure of another with intent to commit a criminal offense therein is guilty of housebreaking and shall be punished as a court-martial may direct."

Article 134 (10 U. S. C. § 934) provides:

"Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court."

allowances, and dishonorable discharge. His conviction was affirmed by the Army Board of Review and, subsequently, by the United States Court of Military Appeals.

Under confinement at the United States Penitentiary at Lewisburg, Pennsylvania, petitioner filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania, alleging, *inter alia,* that the court-martial was without jurisdiction to try him for nonmilitary offenses committed off-post while on an evening pass. The District Court denied relief without considering the issue on the merits, and the Court of Appeals for the Third Circuit affirmed. This Court granted certiorari limited to the question:

> "Does a court-martial, held under the Articles of War, Tit. 10, U. S. C. § 801 *et seq.,* have jurisdiction to try a member of the Armed Forces who is charged with commission of a crime cognizable in a civilian court and having no military significance, alleged to have been committed off-post and while on leave, thus depriving him of his constitutional rights to indictment by a grand jury and trial by a petit jury in a civilian court?" 393 U. S. 822.

The Constitution gives Congress power to "make Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. 14, and it recognizes that the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply. The Fifth Amendment specifically exempts "cases arising *in the land or naval forces,* or in the Militia, when in actual service in time of War or public danger" from the requirement of prosecution by indictment and, inferentially, from the right to trial by jury. (Emphasis supplied.) See *Ex parte Quirin,* 317 U. S. 1, 40. The result has been the estab-

lishment and development of a system of military justice with fundamental differences from the practices in the civilian courts.

If the case does not arise *"in the land or naval forces,"* then the accused gets *first,* the benefit of an indictment by a grand jury and *second,* a trial by jury before a civilian court as guaranteed by the Sixth Amendment and by Art. III, § 2, of the Constitution which provides in part:

> "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

Those civil rights are the constitutional stakes in the present litigation. What we wrote in *Toth* v. *Quarles,* 350 U. S. 11, 17–18, is worth emphasis:

> "We find nothing in the history or constitutional treatment of military tribunals which entitles them to rank along with Article III courts as adjudicators of the guilt or innocence of people charged with offenses for which they can be deprived of their life, liberty or property. Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. But trial of soldiers to maintain discipline is merely incidental to an army's primary fighting function. To the extent that those responsible for performance of this primary function are diverted from it by the necessity of trying cases, the basic fighting purpose of armies is not served. And conceding to military personnel that high degree of honesty and sense of justice which nearly all of them undoubtedly have, it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of

qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts. For instance, the Constitution does not provide life tenure for those performing judicial functions in military trials. They are appointed by military commanders and may be removed at will. Nor does the Constitution protect their salaries as it does judicial salaries. Strides have been made toward making courts-martial less subject to the will of the executive department which appoints, supervises and ultimately controls them. But from the very nature of things, courts have more independence in passing on the life and liberty of people than do military tribunals.

"Moreover, there is a great difference between trial by jury and trial by selected members of the military forces. It is true that military personnel because of their training and experience may be especially competent to try soldiers for infractions of military rules. Such training is no doubt particularly important where an offense charged against a soldier is purely military, such as disobedience of an order, leaving post, etc. But whether right or wrong, the premise underlying the constitutional method for determining guilt or innocence in federal courts is that laymen are better than specialists to perform this task. This idea is inherent in the institution of trial by jury."

A court-martial is tried, not by a jury of the defendant's peers which must decide unanimously, but by a panel of officers [2] empowered to act by a two-thirds vote.

[2] Under Art. 25 (c) of the Uniform Code of Military Justice, 10 U. S. C. § 825 (c), at least one-third of the members of the court-martial trying an enlisted man are required to be enlisted men if the accused requests that enlisted personnel be included in the court-martial. In practice usually only senior enlisted personnel, *i. e.*,

The presiding officer at a court-martial is not a judge whose objectivity and independence are protected by tenure and undiminishable salary and nurtured by the judicial tradition, but is a military law officer.[3] Substantially different rules of evidence and procedure apply in military trials.[4] Apart from those differences, the suggestion of the possibility of influence on the actions of the court-martial by the officer who convenes it, selects its members and the counsel on both sides, and who usually has direct command authority over its members is a pervasive one in military law, despite strenuous efforts to eliminate the danger.[5]

---

noncommissioned officers, are selected. See *United States* v. *Crawford*, 15 U. S. C. M. A. 31, 35 C. M. R. 3, motion for leave to file petition for certiorari denied, 380 U. S. 970. See generally Schiesser, Trial by Peers: Enlisted Members on Courts-Martial, 15 Catholic U. L. Rev. 171 (1966).

[3] At the time petitioner was tried, a general court-martial was presided over by a "law officer," who was required to be a member of the bar and certified by the Judge Advocate General for duty as a law officer. U. C. M. J. Art. 26 (a). The "law officer" could be a direct subordinate of the convening authority. Manual for Courts-Martial, United States, 1951, ¶4g (1). The Military Justice Act of 1968, 82 Stat. 1335, establishes a system of "military judges" intended to insure that where possible the presiding officer of a court-martial will be a professional military judge, not directly subordinate to the convening authority.

[4] For example, in a court-martial, the access of the defense to compulsory process for obtaining evidence and witnesses is, to a significant extent, dependent on the approval of the prosecution. *United States* v. *Harvey*, 8 U. S. C. M. A. 538, 25 C. M. R. 42, approving Manual for Courts-Martial, United States, 1951, ¶115a. See Melnick, The Defendant's Right to Obtain Evidence: An Examination of the Military Viewpoint, 29 Mil. L. Rev. 1 (1965).

[5] See, *e. g.*, the cases listed in Hearings on Constitutional Rights of Military Personnel before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary pursuant to S. Res. No. 260, 87th Cong., 2d Sess., 780–781 (1962), in each of which the Court of Military Appeals reversed court-martial convictions on the ground of excessive command influence.

A court-martial is not yet an independent instrument of justice but remains to a significant degree a specialized part of the overall mechanism by which military discipline is preserved.[6]

That a system of specialized military courts, proceeding by practices different from those obtaining in the regular courts and in general less favorable to defendants, is necessary to an effective national defense establishment, few would deny. But the justification for such a system rests on the special needs of the military, and history teaches that expansion of military discipline beyond its proper domain carries with it a threat to liberty. This Court, mindful of the genuine need for special military courts, has recognized their propriety in their appropriate sphere, *e. g., Burns* v. *Wilson,* 346 U. S. 137, but in examining the reach of their jurisdiction, it has recognized that

> "There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution. Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service. . . .
>
> "Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to *'the least possible power adequate to the end proposed.'*" *Toth* v. *Quarles,* 350 U. S. 11, 22–23.

While the Court of Military Appeals takes cognizance of some constitutional rights of the accused who are court-martialed, courts-martial as an institution are singularly inept in dealing with the nice subtleties of constitutional law. Article 134, already quoted, punishes

---

[6] See *Reid* v. *Covert,* 354 U. S. 1, 36.

as a crime "all disorders and neglects to the prejudice of good order and discipline in the armed forces." Does this satisfy the standards of vagueness as developed by the civil courts? It is not enough to say that a court-martial may be reversed on appeal. One of the benefits of a civilian trial is that the trap of Article 134 may be avoided by a declaratory judgment proceeding or otherwise. See *Dombrowski* v. *Pfister,* 380 U. S. 479. A civilian trial, in other words, is held in an atmosphere conducive to the protection of individual rights, while a military trial is marked by the age-old manifest destiny of retributive justice.[7]

As recently stated: "None of the travesties of justice perpetrated under the UCMJ is really very surprising, for military law has always been and continues to be primarily an instrument of discipline, not justice." Glasser, Justice and Captain Levy, 12 Columbia Forum 46, 49 (1969).

The mere fact that petitioner was at the time of his offense and of his court-martial on active duty in the Armed Forces does not automatically dispose of this case under our prior decisions.

---

[7] For sobering accounts of the impact of so-called military justice on civil rights of members of the Armed Services see Hearings on Constitutional Rights of Military Personnel before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary pursuant to S. Res. No. 260, 87th Cong., 2d Sess., Feb. 20 and 21, March 1, 2, 6, 9, and 12, 1962; Joint Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary and a Special Subcommittee of the Senate Armed Services Committee, 89th Cong., 2d Sess., on S. 745 et al., Pt. 1, Jan. 18, 19, 25, and 26, March 1, 2, and 3, 1966, and Pt. 2. For a newly enacted Military Justice Act see 82 Stat. 1335. And see Summary-Report of Hearings on Constitutional Rights of Military Personnel, by the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, pursuant to S. Res. No. 58, 88th Cong., 1st Sess. (1963) (Comm. Print).

We have held in a series of decisions that court-martial jurisdiction cannot be extended to reach any person not a member of the Armed Forces at the times of both the offense and the trial. Thus, discharged soldiers cannot be court-martialed for offenses committed while in service. *Toth* v. *Quarles,* 350 U. S. 11. Similarly, neither civilian employees of the Armed Forces overseas, *McElroy* v. *Guagliardo,* 361 U. S. 281; *Grisham* v. *Hagan,* 361 U. S. 278; nor civilian dependents of military personnel accompanying them overseas, *Kinsella* v. *Singleton,* 361 U. S. 234; *Reid* v. *Covert,* 354 U. S. 1, may be tried by court-martial.

These cases decide that courts-martial have no jurisdiction to try those who are not members of the Armed Forces, no matter how intimate the connection between their offense and the concerns of military discipline. From these cases, the Government invites us to draw the conclusion that once it is established that the accused is a member of the Armed Forces, lack of relationship between the offense and identifiable military interests is irrelevant to the jurisdiction of a court-martial.

The fact that courts-martial have no jurisdiction over nonsoldiers, whatever their offense, does not necessarily imply that they have unlimited jurisdiction over soldiers, regardless of the nature of the offenses charged. Nor do the cases of this Court suggest any such interpretation. The Government emphasizes that these decisions—especially *Kinsella* v. *Singleton*—establish that liability to trial by court-martial is a question of "status"—"whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.'" 361 U. S., at 241. But that is merely the beginning of the inquiry, not its end. "Status" is necessary for jurisdiction; but it does not follow that ascertainment of "status" completes the inquiry, regardless of the nature, time, and place of the offense.

Both in England prior to the American Revolution and in our own national history military trial of soldiers committing civilian offenses has been viewed with suspicion.[8] Abuses of the court-martial power were an important grievance of the parliamentary forces in the English constitutional crises of the 17th century. The resolution of that conflict came with the acceptance by William and Mary of the Bill of Rights in 1689 which established that in the future, Parliament, not the Crown, would have the power to define the jurisdiction of courts-martial. 1 W. & M., Sess. 2, c. 2. The 17th century conflict over the proper role of courts-martial in the enforcement of the domestic criminal law was not, however, merely a dispute over what organ of government had jurisdiction. It also involved substantive disapproval of the general use of military courts for trial of ordinary crimes.[9]

Parliament, possessed at last of final power in the matter, was quick to authorize, subject to annual renewal, maintenance of a standing army and to give authority for trial by court-martial of certain crimes closely related to military discipline. But Parliament's new power over courts-martial was exercised only very sparingly to ordain military jurisdiction over acts which were also offenses at common law. The first of the annual mutiny acts, 1 W. & M., c. 5, set the tone. It established the general rule that

> "noe Man may be forejudged of Life or Limbe, or subjected to any kinde of punishment by Martiall

---

[8] The record of historical concern over the scope of court-martial jurisdiction is extensively reviewed in MR. JUSTICE BLACK's opinion for a plurality of the Court in *Reid* v. *Covert*, 354 U. S. 1, 23–30. See also, Duke & Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vand. L. Rev. 435, 441–449 (1960); F. Wiener, Civilians Under Military Justice (1967) (hereinafter cited as Wiener).

[9] See *Reid* v. *Covert*, 354 U. S. 1, 23–26.

Law or in any other manner than by the Judgement of his Peeres and according to the knowne and Established Laws of this Realme."

And it proceeded to grant courts-martial jurisdiction only over mutiny, sedition, and desertion. In all other respects, military personnel were to be subject to the "Ordinary Processe of Law."

The jurisdiction of British courts-martial over military offenses which were also common-law felonies was from time to time extended,[10] but, with the exception of one year,[11] there was never any general military jurisdiction to try soldiers for ordinary crimes committed in the British Isles. It was, therefore, the rule in Britain at the time of the American Revolution that a soldier could not be tried by court-martial for a civilian offense committed in Britain; instead military officers were required to use their energies and office to insure that the accused soldier would be tried before a civil court.[12] Evasion

---

[10] See Wiener c. 1.

[11] The Mutiny Act of 1720, 7 Geo. 1, c. 6, provided that a soldier could be court-martialed for "any Capital Crime, or . . . any Violence or Offence against the Person, Estate, or Property of any of the Subjects of this Kingdom, which is punishable by the known Laws of the Land" unless the civil authorities within eight days of the offense demanded that the accused soldier be turned over to them for trial. In November 1720, the law officers of the Army relied on this new provision of the Mutiny Act to give an opinion that it was proper to try a soldier in Scotland—where ordinary civil courts were functioning—by court-martial for an offense which would have been murder if prosecuted in the civil courts. See Wiener 245–246. The very next year—perhaps in response to that ruling, Wiener 14— the provision was eliminated and did not reappear. The 1721 Act and its successors provided for military trial of common-law crimes only where ordinary civil courts were unavailable. See Prichard, The Army Act and Murder Abroad, 1954 Camb. L. J. 232; Wiener 14, 24–28.

[12] Failure to produce a soldier for civil trial was a military offense by the officer concerned. *E. g.*, British Articles of War of 1765, § 11,

and erosion of the principle that crimes committed by soldiers should be tried according to regular judicial procedure in civil, not military, courts, if any were available, were among the grievances protested by the American Colonists.[13]

Early American practice followed the British model.[14] The Continental Congress, in enacting articles of war in 1776, emphasized the importance of military authority cooperating to insure that soldiers who committed crimes were brought to justice. But it is clear from the context

Art. 1, reprinted in W. Winthrop, Military Law and Precedents *1448, *1456 (2d ed. 1896, 1920 reprint) (hereinafter cited as Winthrop).

[13] See *Reid* v. *Covert*, 354 U. S. 1, 27–28 and n. 49.

[14] In its brief the Government lists a large number of courts-martial in the very early days of the Nation which it claims indicate that military trial for civil offenses was common in that period. The facts of the cases, as reflected in the brief summaries which are available to us, suggest no such conclusion. In almost every case summarized, it appears that some special military interest existed. Many are peculiarly military crimes—desertions, assaults on and thefts from other soldiers, and stealing government property. While those acts might also be felonies, by the time of the Revolutionary War offenses such as these long had been defined as distinctively military crimes in the Mutiny Acts. Many of the remainder are identifiably prosecutions for abusing military position by plundering the civil population or abusing its women while on duty. Many of the other cases in which the offense is stealing or assault on an individual were perhaps of this sort also, especially where the victim is referred to as "inhabitant." Most of the rest simply recite the offender and the offense and give no basis for judging the relationship of the offense to military discipline. Those few which do appear to involve civilian crimes in clearly civilian settings appear also to have been committed by officers. In the 18th century at least the "honor" of an officer was thought to give a specific military connection to a crime otherwise without military significance. Moreover, all those courts-martial held between 1773 and 1783 were for the trial of acts committed in wartime and, given the pattern of fighting in those days, in the immediate theater of operations.

of the provision it enacted that it expected the trials would be in civil courts.[15]   The "general article," which punished "[a]ll crimes not capital, and all disorders and neglects, which officers and soldiers may be guilty of, to the prejudice of good order and military discipline, though not mentioned in the foregoing articles of war," was interpreted to embrace only crimes the commission of which had some direct impact on military discipline. Winthrop *1123.   While practice was not altogether consistent, during the 19th century court-martial convictions for ordinary civil crimes were from time to time set aside by the reviewing authority on the ground that the charges recited only a violation of the general criminal law and failed to state a military offense. *Id.,* *1124, nn. 82, 88.[16]

During the Civil War, Congress provided for military trial of certain civil offenses[17] without regard to their effect on order and discipline, but the act applied only "in time of war, insurrection, or rebellion."   Act of Mar. 3, 1863, c. 75, § 30, 12 Stat. 736; Rev. Stat. § 1342, Art. 58 (1874).   In 1916, on the eve of World War I, the Articles of War were revised, 39 Stat. 650, to provide for military trial, even in peacetime, of certain specific civil-

---

[15] 1776 Articles of War, § 10, Art. 1, reprinted in Winthrop *1494.

[16] Cf. *Ex parte Mason,* 105 U. S. 696, 698, in which the Court, sustaining a court-martial conviction, under the general article, of a military guard who killed a prisoner, said, "[s]hooting with intent to kill is a civil crime, but shooting by a soldier of the army standing guard over a prison, with intent to kill a prisoner confined therein, is not only a crime against society, but an atrocious breach of military discipline."

[17] Larceny, robbery, burglary, arson, mayhem, manslaughter, murder, assault and battery with intent to kill, wounding by shooting or stabbing with an intent to commit murder, rape, or assault and battery with an intent to commit rape.   Rev. Stat. § 1342, Art. 58 (1874).

ian crimes committed by persons "subject to military law" and the general article, Art. 96, was modified to provide for military trial of "all crimes or offenses not capital." In 1950, the Uniform Code of Military Justice extended military jurisdiction to capital crimes as well.

We have concluded that the crime to be under military jurisdiction must be service connected, lest "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger," [18] as used

----

[18] It has been suggested, at various times, that the phrase "when in actual service in time of War or public danger" should be read to require a grand jury indictment in *all* cases "arising in the land or naval forces, or in the Militia," except when the defendant is in "service in time of War or public danger." It was decided at a very early date, however, that the above clause modifies only "Militia." Thus, the generally accepted rule is that indictment by grand jury is *never* necessary "in cases arising in the land or naval forces" but is necessary for members of the militia, except when they have been "called into the actual Service of the United States" (Art. II, § 2, U. S. Const.) "to execute the Laws of the Union, suppress Insurrections and repel Invasions." Art. I, § 8, U. S. Const.

"The limitation as to 'actual service in time of war or public danger' relates only to the militia." *Ex parte Mason,* 105 U. S. 696, 701. See also *Smith* v. *Whitney,* 116 U. S. 167, 186; *Kurtz* v. *Moffitt,* 115 U. S. 487, 500; *Dynes* v. *Hoover,* 20 How. 65.

*Johnson* v. *Sayre,* 158 U. S. 109, was a case in which a Navy paymaster sought habeas corpus from his court-martial conviction for embezzlement in time of peace by arguing that he was entitled to indictment by grand jury:

"The decision below is based upon the construction that the words 'when in actual service in time of war or public danger' refer, not merely to the last antecedent, 'or in the militia,' but also to the previous clause, 'in the land or naval forces.' That construction is grammatically possible. But it is opposed to the evident meaning of the provision, taken by itself, and still more so, when it is considered together with the other provisions of the Constitution." *Id.,* at 114. And see *Thompson* v. *Willingham,* 217 F. Supp. 901 (D. C. M. D. Pa.), aff'd, 318 F. 2d 657 (C. A. 3d Cir.).

in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers. The power of Congress to make "Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. 14, need not be sparingly read in order to preserve those two important constitutional guarantees. For it is assumed that an express grant of general power to Congress is to be exercised in harmony with express guarantees of the Bill of Rights. We were advised on oral argument that Art. 134 is construed by the military to give it power to try a member of the armed services for income tax evasion. This article has been called "a catch-all" that "incorporates almost every Federal penal statute into the Uniform Code." R. Everett, Military Justice in the Armed Forces of the United States 68–69 (1956). The catalogue of cases put within reach of the military is indeed long; and we see no way of saving to servicemen and servicewomen in any case the benefits of indictment and of trial by jury, if we conclude that this petitioner was properly tried by court-martial.

In the present case petitioner was properly absent from his military base when he committed the crimes with which he is charged. There was no connection—not even the remotest one—between his military duties and the crimes in question. The crimes were not committed on a military post or enclave; nor was the person whom he attacked performing any duties relating to the military. Moreover, Hawaii, the situs of the crime, is not an armed camp under military control, as are some of our far-flung outposts.

Finally, we deal with peacetime offenses, not with authority stemming from the war power. Civil courts were open. The offenses were committed within our territorial limits, not in the occupied zone of a foreign coun-

try. The offenses did not involve any question of the flouting of military authority, the security of a military post, or the integrity of military property.[19]

We have accordingly decided that since petitioner's crimes were not service connected, he could not be tried by court-martial but rather was entitled to trial by the civilian courts.

*Reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

I consider that the terms of the Constitution and the precedents in this Court point clearly to sustaining court-martial jurisdiction in this instance. The Court's largely one-sided discussion of the competing individual and governmental interests at stake, and its reliance upon what are at best wholly inconclusive historical data, fall far short of supporting the contrary conclusion which the majority has reached. In sum, I think that the

---

[19] Winthrop in commenting on the phrase "to the prejudice of good order and military discipline" in a predecessor article to Article 134 said:

"A crime, therefore, to be cognizable by a court-martial under this Article, must have been committed under such circumstances as to have directly offended against the government and discipline of the military state. Thus such crimes as theft from or robbery of an officer, soldier, post trader, or camp-follower; forgery of the name of an officer, and manslaughter, assault with intent to kill, mayhem, or battery, committed upon a military person; inasmuch as they directly affect military relations and prejudice military discipline, may properly be—as they frequently have been—the subject of charges under the present Article. On the other hand, where such crimes are committed upon or against *civilians,* and not at or near a military camp or post, or in breach or violation of a military duty or order, they are not in general to be regarded as within the description of the Article, but are to be treated as civil rather than military offenses." Pp. *1124–*1125.

Court has grasped for itself the making of a determination which the Constitution has placed in the hands of the Congress, and that in so doing the Court has thrown the law in this realm into a demoralizing state of uncertainty.  I must dissent.

## I.

My starting point is the language of Art. I, § 8, cl. 14, of the Constitution, which empowers the Congress "[t]o make Rules for the Government and Regulation of the land and naval Forces," and the Fifth Amendment's correlative exception for "cases arising in the land or naval forces."

Writing for a plurality of the Court in *Reid* v. *Covert,* 354 U. S. 1 (1957), MR. JUSTICE BLACK explained that if the "language of Clause 14 is given its natural meaning . . . [t]he term 'land and naval Forces' refers to persons who are members of the armed services . . . ," *id.,* at 19–20, and that accordingly the Fifth Amendment's exception encompasses persons " 'in' the armed services." *Id.,* at 22–23.  In *Kinsella* v. *Singleton,* 361 U. S. 234 (1960), again looking to the constitutional language, the Court noted that "military jurisdiction has always been based on the 'status' of the accused, rather than on the nature of the offense," *id.,* at 243; that is, whether the accused "is a person who can be regarded as falling within the term 'land and naval Forces.' " *Id.,* at 241.

In these cases and many others, *Ex parte Milligan,* 4 Wall. 2, 123 (1866); *Coleman* v. *Tennessee,* 97 U. S. 509 (1879); *Smith* v. *Whitney,* 116 U. S. 167, 184–185 (1886); *Johnson* v. *Sayre,* 158 U. S. 109, 114 (1895); *Grafton* v. *United States,* 206 U. S. 333, 348 (1907), this Court has consistently asserted that military "status" is a necessary *and sufficient* condition for the exercise of court-martial jurisdiction.  The Court has never previously questioned what the language of Clause 14 would

seem to make plain—that, given the requisite military status, it is for Congress and not the Judiciary to determine the appropriate subject-matter jurisdiction of courts-martial. See *Coleman* v. *Tennessee, supra,* at 514.

## II.

English constitutional history provides scant support for the Court's novel interpretation of Clause 14, and the pertinent American history proves, if anything, quite the contrary.

The English history on which the majority relies reveals a long-standing and multifaceted struggle for power between the military and the Crown, on the one hand, and Parliament on the other, which focused, *inter alia,* on the King's asserted independent prerogative to try soldiers by court-martial in time of peace. See generally J. Tanner, English Constitutional Conflicts of the Seventeenth Century (1961). The martial law of the time was, moreover, arbitrary, and alien to established legal principles. See 1 W. Blackstone's Commentaries 413; M. Hale, History and Analysis of the Common Law in England 42 (6th ed. 1820). Thus, when, with the Glorious Revolution of 1688, Parliament gained exclusive authority to create peacetime court-martial jurisdiction, it exercised that authority sparingly: the early Mutiny Acts permitted trial by court-martial only for the crimes of mutiny, sedition, and desertion. *E. g.,* Mutiny Act of 1689, 1 W. & M., Sess. 2, c. 4.

Parliament subsequently expanded the military's peacetime jurisdiction both abroad and at home. See Mutiny Act of 1712, 12 Anne, c. 13; Mutiny Act of 1803, 43 Geo. 3, c. 20. And, significantly, § 46 of the Mutiny Act of 1720, 7 Geo. 1, c. 6, authorized trial by court-martial for offenses of a nonmilitary nature, if the injured civilian made no request that the accused be tried in the

civil courts. See F. Wiener, Civilians Under Military Justice 13–14, 245–246 (1967).[1]

The burden of English history was not lost on the Framers of our Constitution, who doubtless feared the Executive's assertion of an independent military authority unchecked by the people acting through the Legislature. Article 9, § 4, of the Articles of Confederation—from which Art. I, § 8, cl. 14, of the Constitution was taken [2]—was responsive to this apprehension:

> "The United States in Congress assembled shall . . . have the *sole and exclusive* right and power of . . . making rules for the government and regulation of the . . . land and naval forces, and directing their operations." (Emphasis added.)

But nothing in the debates over our Constitution indicates that the *Congress* was forever to be limited to the precise scope of court-martial jurisdiction existing in 17th century England. To the contrary, Alexander Hamilton stated that Congress' power to prescribe rules for the government of the armed forces "ought to exist without limitation: Because it is impossible to foresee or define the extent and variety of national exigencies, or the corresponding extent & variety of the means which may be necessary to satisfy them." The Federalist, No. 23. (Emphasis omitted.)

---

[1] This proviso was dropped in the Mutiny Act of 1721, 8 Geo. 1, c. 3, and court-martial jurisdiction over such offenses was thereafter limited by the articles of war to, *inter alia*, "Place[s] beyond the Seas . . . where there is no form of Our Civil Judicature in Force." F. Wiener, Civilians Under Military Justice 14 (1967).

[2] See 2 M. Farrand, The Records of the Federal Convention of 1787, p. 330 (1911); 5 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787, p. 443 (1836).

278

American exercise of court-martial jurisdiction prior to, and contemporaneous with, adoption of the Constitution lends no support to the Court's position. Military records between the end of the War of Independence and the beginning of the War of 1812 show frequent instances of trials by court-martial, east of the frontier, for offenses against civilians and the civil laws, such as theft, assault, and killing livestock.[3] Military authority to try soldiers for such offenses derived initially from the "general article" of war, first enacted by the Continental Congress in 1775,[4] and incorporated today in Art. 134, 10 U. S. C. § 934. W. Winthrop's Military Law and Precedents (2d ed. 1896), the leading 19th century treatise on military law, recognized that the general article encompassed crimes "committed upon or against *civilians* . . . at or *near* a military camp or post," *id.,* at 724 (1920

---

[3] For example: The general orders of George Washington report the trial of soldiers for "killing a Cow . . . , stealing Fowls . . . , and stealing eleven Geese . . . ." 26 Writings of George Washington 73 (Bicent. ed.) (H. Q., Newburgh, January 28, 1783), and "for stealing a number of Shirts and blanketts out of the public store at Newburgh . . . ." *Id.,* at 322 (H. Q., Newburgh, April 15, 1783). The Orderly Books of the Corps of Artillerists and Engineers report the court-martial of Sergeant Harris for "beating a Mr. Williams an inhabitant living near this garrison," Book 1, pp. 157–158 (West Point, October 5, 1795), and of Private Kelly for "abusing and using violence on Mrs. Cronkhyte, a citizen of the United States." Book 3, pp. 45–46 (West Point, July 5, 1796). Numerous other instances of military punishment for nonmilitary crimes during the period 1775–1815 are summarized in the appendix to the Brief for the United States 35–52.

[4] "All crimes, not capital, and all disorders and neglects, which officers and soldiers may be guilty of, to the prejudice of good order and military discipline, though not mentioned in the articles of war, are to be taken cognizance of by a general or regimental court-martial, according to the nature and degree of the offence, and be punished at their discretion." W. Winthrop, Military Law and Precedents 957 (2d ed. 1896, 1920 reprint).

reprint) (second emphasis added), and noted that even this limiting principle was not strictly observed. *Id.*, at 725, 730–732. And in *Grafton* v. *United States*, 206 U. S. 333, 348 (1907), the Court held, with respect to the general article, that:

> "The crimes referred to in that article manifestly embrace those not capital, committed by officers or soldiers of the Army in violation of public law as enforced by the civil power. No crimes committed by officers or soldiers of the Army are excepted by the . . . article from the jurisdiction thus conferred upon courts-martial, except those that are capital in their nature. . . . [T]he jurisdiction of general courts-martial [is] . . . concurrent with that of the civil courts." [5]

---

[5] In 1916, Congress for the first time explicitly authorized peacetime court-martial jurisdiction for specific noncapital offenses. Article 93, Articles of War, 39 Stat. 664. It also revised the general article, renumbered Article 96, to read:

"Though not mentioned in these articles, all disorders and neglects to the prejudice of good order and military discipline, all conduct of a nature to bring discredit upon the military service, and all crimes or offenses not capital, of which persons subject to military law may be guilty, shall be taken cognizance of by a general or special or summary court-martial, according to the nature and degree of the offense, and punished at the discretion of such court."

Testifying before the Senate Subcommittee on Military Affairs, Brigadier General Crowder, the Judge Advocate General of the Army, explained the revision (cf. n. 4, *supra*):

"You will notice some transposition of language. The phrase 'to the prejudice of good order and military discipline' is put in in such a way that it qualifies only 'all disorders and neglects.' As the law stands to-day it was often contended that this phrase qualified also 'all crimes not capital.' There was some argument about whether it would reach back through that clause, 'all disorders and neglects,' to the clause 'all crimes not capital' and qualify the latter clause. . . . [B]ut Justice Harlan, in the decision in the Grafton case, seems to have set the matter at rest, and I am

Even if the practice of early American courts-martial
had been otherwise, this would hardly lead to the con-
clusion that Congress lacked power to authorize military
trials under the present circumstances. It cannot be
seriously argued as a general matter that the constitu-
tional limits of congressional power are coterminous
with the extent of its exercise in the late 18th and
early 19th centuries.[6] And however restrictively the
power to define court-martial jurisdiction may be con-
strued, it would be patently wrong so to limit that
power. The disciplinary requirements of today's armed
force of over 3,000,000 men [7] are manifestly different from
those of the 718-man army [8] in existence in 1789. Cf.
The Federalist, No. 23, quoted, *supra,* at 277. By the
same token, given an otherwise valid exercise of the
Article I power, I can perceive no basis for judicial
curtailment of court-martial jurisdiction as Congress
has enacted it.

proposing legislation along the lines of Justice Harlan's decision."
Hearings before the Senate Subcommittee on Military Affairs, an
Appendix to S. Rep. No. 130, 64th Cong., 1st Sess., 25, 91.

The Act of March 3, 1863, § 30, 12 Stat. 736, authorized pun-
ishment for specific nonmilitary crimes, including capital ones,
in time of war, insurrection, or rebellion. Article 92 of the 1916
Articles of War, 39 Stat. 664, made murder and rape punishable
by death, but provided that "no person shall be tried by court-
martial for murder or rape committed within the geographical limits
of the States of the Union and the District of Columbia in time of
peace." This proviso was deleted in the Uniform Code of Military
Justice, Articles 118, 120, 10 U. S. C. §§ 918, 920, so that today
there is no jurisdictional distinction between capital and noncapital
offenses.

[6] On such a theory, for example, Congress could not have per-
missibly waited, as it did, until 1875, see Act of March 3, 1875, § 1,
18 Stat. 470, to confer general federal-question jurisdiction on the
district courts; the present-day exercise of this jurisdiction, see
28 U. S. C. § 1331, would be unconstitutional.

[7] Statistical Abstract of The United States 257 (1968).

[8] R. Weigley, History of the United States Army 566 (1967).

## III.

In the light of the language and history of Art. 1, § 8, cl. 14, of the Constitution, and this Court's hitherto consistent interpretation of this provision, I do not believe that the resolution of the controversy before us calls for any balancing of interests. But if one does engage in a balancing process, one cannot fairly hope to come up with a meaningful answer unless the interests on both sides are fully explored. The Court does not do this. Rather, it chooses to ignore strong and legitimate governmental interests which support the exercise of court-martial jurisdiction even over "nonmilitary" crimes.

The United States has a vital interest in creating and maintaining an armed force of honest, upright, and well-disciplined persons, and in preserving the reputation, morale, and integrity of the military services. Furthermore, because its personnel must, perforce, live and work in close proximity to one another, the military has an obligation to protect each of its members from the misconduct of fellow servicemen.[9] The commission of offenses against the civil order manifests qualities of attitude and character equally destructive of military order and safety. The soldier who acts the part of Mr. Hyde while on leave is, at best, a precarious Dr. Jekyll when back on duty. Thus, as General George Washington recognized:

"All improper treatment of an inhabitant by an officer or soldier being destructive of good order and

---

[9] Congress may also assume the responsibility of protecting civilians from harms perpetrated by members of the armed forces. For the military is often responsible for bringing to a locality thousands of its personnel—whose numbers may be as great as, and sometimes exceed, the neighboring population—thereby imposing on the local law-enforcement agencies a burden which they may be unable to carry.

discipline as well as subversive of the rights of society is as much a breach of military, as civil law and as punishable by the one as the other." 14 Writings of George Washington 140–141 (Bicent. ed.).

A soldier's misconduct directed against civilians, moreover, brings discredit upon the service of which he is a member:

> "Under every system of military law for the government of either land or naval forces, the jurisdiction of courts martial extends to the trial and punishment of acts of military or naval officers which tend to bring disgrace and reproach upon the service of which they are members, whether those acts are done in the performance of military duties, or in a civil position . . . ." *Smith* v. *Whitney*, 116 U. S. 167, 183–184 (1886).

The Government, thus, has a proper concern in keeping its own house in order, by deterring members of the armed forces from engaging in criminal misconduct on or off the base, and by rehabilitating offenders to return them to useful military service.[10]

The exercise of military jurisdiction is also responsive to other practical needs of the armed forces. A soldier detained by the civil authorities pending trial, or subsequently imprisoned, is to that extent rendered useless to the service. Even if he is released on bail or recognizance, or ultimately placed on probation, the civil authorities may require him to remain within the juris-

---

[10] Thus, at petitioner's presentence hearing, Captain Powell testified that "through proper rehabilitation, O'Callahan can make a good soldier," Record Transcript 61, and Major Turner testified:

"He has given superior performance, as far as I know. . . . He has gone through school and the Army does have a lot of money wrapped up in this man. . . . I think at this time, here that a rehabilitation program is in order." *Id.*, at 64.

diction, thus making him unavailable for transfer with the rest of his unit or as the service otherwise requires.

In contrast, a person awaiting trial by court-martial may simply be restricted to limits, and may "participate in all military duties and activities of his organization while under such restriction." Manual for Courts-Martial, United States (1969), ¶ 20 *b.* The trial need not be held in the jurisdiction where the offense was committed. *Id.,* ¶ 8. See, *e. g., United States* v. *Voorhees,* 4 U. S. C. M. A. 509, 515, 16 C. M. R. 83, 89 (1954); cf. *United States* v. *Gravitt,* 5 U. S. C. M. A. 249, 256, 17 C. M. R. 249, 256 (1954). And punishments—such as forfeiture of pay, restriction to limits, and hard labor without confinement—may be imposed that do not keep the convicted serviceman from performing his military duties. See Manual for Courts-Martial, *supra,* ¶¶ 126 *g, h, k.*

## IV.

The Court does not explain the scope of the "service-connected" crimes as to which court-martial jurisdiction is appropriate, but it appears that jurisdiction may extend to "nonmilitary" offenses in appropriate circumstances. Thus, the Court intimates that it is relevant to the jurisdictional issue in this case that petitioner was wearing civilian clothes rather than a uniform when he committed the crimes. *Ante,* at 259. And it also implies that plundering, abusing, and stealing from, civilians may sometimes constitute a punishable abuse of military position, *ante,* at 270, n. 14, and that officers may be court-martialed for purely civilian crimes, because "[i]n the 18th century . . . the 'honor' of an officer was thought to give a specific military connection to a crime otherwise without military significance." [11] *Ibid.* But if these

---

[11] It is, to say the least, strange that as a *constitutional* matter the military is without authority to discipline an enlisted man for an offense that is punishable if committed by an officer.

are illustrative cases, the Court suggests no general standard for determining when the exercise of court-martial jurisdiction is permissible.

Whatever role an *ad hoc* judicial approach may have in some areas of the law, the Congress and the military are at least entitled to know with some certainty the allowable scope of court-martial jurisdiction. Otherwise, the infinite permutations of possibly relevant factors are bound to create confusion and proliferate litigation over the jurisdictional issue in each instance. Absolutely nothing in the language, history, or logic of the Constitution justifies this uneasy state of affairs which the Court has today created.

I would affirm the judgment of the Court of Appeals.