UNITED STATES

v.

Specialist (E–4) Paul D. FORNASH, 278–60–1713, United States Army, Headquarters and Headquarters Detachment, 3d Basic Combat Training Brigade, Fort Ord, California.

CM 433821.

U. S. Army Court of Military Review.

Sentence Adjudged 14 Aug. 1975.

Decided 18 Nov. 1976.

Appellate Counsel for the Accused: CPT Ralph E. Sharpe, JAGC; MAJ Richard J. Goddard, JAGC; COL Alton H. Harvey, JAGC.

Appellate Counsel for the United States: CPT Richard A. Gallivan, JAGC; CPT Gary F. Thorne, JAGC; MAJ John T. Sherwood, Jr., JAGC; LTC Donald W. Hansen, JAGC.

## OPINION OF THE COURT

DRIBBEN, Judge:

A general court-martial with members convicted appellant, pursuant to his plea, of conspiracy to import marijuana unlawfully into the United States in violation of Article 81, Uniform Code of Military Justice (U.C.M.J.), 10 U.S.C. § 881. He was sentenced to a dishonorable discharge, confinement at hard labor for two years, forfeiture of $50.00 pay per month for 24 months, and reduction to the grade of Private E–1. The approved sentence is noted above.

The charge of which appellant was convicted alleged that at Fort Ord, California, on or about 21 May 1975, he conspired with other individuals to commit the unlawful importation offense and to effect that conspiracy, appellant and other Fort Ord soldiers took two boxes addressed to the Commander, 3d Basic Combat Training (BCT) Brigade, Fort Ord, California from the Fort Ord Post Office and loading dock of the 3d BCT Brigade mail room, put new address labels thereon, and attempted to place them into a co-conspirator's automobile.

The operative facts of record reveal that appellant was a member of a "drug importing ring."[1] This ring included soldiers at Fort Ord, one of whom was a mail clerk in the 3d BCT Brigade mail room, and in the Panama Canal Zone and unknown others including civilians living in the vicinity of Fort Ord. Appellant and his local military co-conspirators, all of whose duties either placed them in or near the mail room, were

---

1. The phrase "drug importing ring" is used in a stipulation of fact entered into by the accused and the prosecution and admitted into evidence by the military judge.

to intercept packages containing controlled substances arriving at the 3d BCT Brigade mail room from the Fort Ord Post Office. They were alerted in advance by the civilians to arrival of the packages. Upon identification, these items were removed from the mail room and transported off post to the civilians in return for money paid by the latter to the military co-conspirators. According to appellant's sworn testimony in extenuation and mitigation, his civilian co-conspirators did all of the planning and passed on directions to appellant at his off-post residence. He also testified that, according to the civilians, none of the imported marijuana was being distributed at Fort Ord. The boxes which arrived at Fort Ord on 21 May 1975 together contained over 20,000 grams of marijuana, a fact known to appellant. They were mailed through Army postal facilities in Panama by a military co-conspirator.

### I

■ Appellant challenges his conviction asserting that the offense lacked "service connection" and thus, under the principle set forth in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) the court-martial did not have jurisdiction to proceed. Appellant's counsel rely upon the Court of Military Appeals decision in *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969) in support of their con-

tention that the court-martial lacked jurisdiction over the offense of unlawful importation of marijuana, emphasizing that portion of Judge Quinn's opinion which said "The record of trial discloses no circumstances surrounding the commission of the offenses (unlawful importation and transportation of marijuana) to relate them specifically to the military." *See also United States v. LeBlanc*, 19 U.S.C.M.A. 381, 41 C.M.R. 381 (1970). Appellate defense counsel further direct our attention to *United States v. Pieragowski*, 19 U.S.C.M.A. 508, 42 C.M.R. 110 (1970); and *United States v. Hughes*, 19 U.S.C.M.A. 510, 42 C.M.R. 112 (1970) wherein the Court of Military Appeals followed the *Beeker* rationale that the offense (smuggling marijuana) was not triable by court-martial, absent a demonstration of circumstances relating the offense specifically to the armed forces although the accused in each instance arrived at a military installation in the United States aboard an aircraft chartered by military authorities.

The Court of Military Appeals has recently re-stated on several occasions the inquiry we must make in order to resolve the question of military jurisdiction raised in the case *sub judice*.[2] The criteria by which service connection is to be measured were originally set forth in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).[3]

---

**2.** *United States v. McCarthy*, 2 M.J. 26 (24 September 1976); *United States v. Hedlund*, 2 M.J. 11 (1976); *United States v. Tucker*, 24 U.S.C.M.A. 311, 52 C.M.R. 22, 1 M.J. 463 (1976); *United States v. Uhlman*, 24 U.S.C.M.A. 256, 51 C.M.R. 635, 1 M.J. 419 (1976).

**3.** "We stress seriatim what is thus emphasized in the holding:

1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

6. The absence of any connection between the defendant's military duties and the crime.
7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.
9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property. One might add still another factor implicit in the others:
12. The offense's being among those traditionally prosecuted in civilian courts." (401 U.S. at page 365, 91 S.Ct. at page 655.)

We also note that *Relford* contains nine other considerations:

"We stress: (a) The essential and obvious interest of the military in the security of per-

In *United States v. Moore*, 24 U.S.C.M.A. 293, 295, 52 C.M.R. 4, 6, 1 M.J. 448 (1976), Chief Judge Fletcher explained that:

"What *Relford* makes clear is the need for a detailed, thorough analysis of the jurisdictional criteria enunciated to resolve the service-connection issue in all cases tried by court-martial. A more simplistic formula, while perhaps desirable, was not deemed constitutionally appropriate by the Supreme Court."

Application of the *Relford* criteria to the facts of the case at bar cause us to conclude that appellant's reliance on *Beeker, LeBlanc, Hughes*, and *Pieragowski*, all *supra*, is misplaced. Although the facts are sketchy in *Beeker* and *LeBlanc*, there was no evidence in those instances that the accused committed any part of the wrongful importation and smuggling offenses on a military reservation, at least not to the extent done in the case *sub judice*. In both *Pieragowski* and *Hughes* the Court pointed out that the charter did not transform the aircraft into a military vehicle and the landing at a military base was a convenience which did not eliminate the civilian character of customs inspections where this inspection was conducted by regular civilian customs agents.

The facts in *United States v. Black*, 24 U.S.C.M.A. 162, 51 C.M.R. 381, 1 M.J. 340 (1976) are also distinguishable from appellant's case. There, the defendant was alleged to have conspired at Saigon with a Vietnamese national to commit the offense of wrongful importation of heroin and to effect the conspiracy he sent a letter from the United States to a friend then in Vietnam containing another letter and currency to be delivered to the Vietnamese. The substance of the enclosed letter to the Vietnamese co-conspirator was that he was to mail the heroin directly to a civilian Florida address to the defendant's wife. In applying the *Relford* criteria, Senior Judge Ferguson found the following factors militated against a conclusion of service connection to the charged conspiracy offense:

"There was no relation between the appellant's military duties and the offense; the offense was not committed on a military reservation; the offense was unrelated to authority stemming from the war power; the co-conspirator was not another soldier or a dependent of another soldier; the 'victim' was not in any way related to the military; a Federal civilian court was available to try the case; the offense involved no flouting of military authority; there was involved no threat to the security of the military post; there was no violation of military property;

sons and of property on the military enclave. . . . (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that . . . the power 'To make Rules for the Government and Regulation of the land and naval Forces,' means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term 'Regulation' itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly non-federal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. . . . (f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. . . . (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post." (at pages 367–369, 91 S.Ct. at 656.)

and the offense—conspiracy to import heroin into the United States—is among those traditionally prosecuted in civilian courts, as the Federal Government has an overriding interest therein and it is 'not specifically related to the military services.' "[4]

We find that the following *Relford* factors in the case *sub judice* make appellant's conspiracy offense subject to the jurisdiction of a court-martial:

1.  The very essence of the conspiracy was dependent upon the utilization of the military postal system. Misuse of this system by the scheme devised posed a threat to property and personnel located on a military installation and had an adverse impact on the morale, discipline, reputation, and integrity of the installation itself.

2.  The substantial connection between the appellant's and his co-conspirators' military duties and the crime.

3.  A potential victim of the conspiracy, the 3d BCT Brigade Commander, to whom these packages were addressed, was a soldier.

4.  The offense involved was specifically related to the military services and involved a flouting of military authority.

In carefully balancing the *Relford* factors "to determine 'whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and whether distinct military interest can be vindicated adequately in civilian courts.' *Schlesinger v. Councilman*, 420 U.S. 738, 760, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975)," [5] we conclude that the distinct military interest in appellant's misconduct was not limited to its devastating impact on morale,[6] discipline, reputation, integrity and security of Fort Ord. Further special military interest and concern was also directed at preventing the use of Fort Ord and its postal

system as a base for distribution of marijuana into the surrounding civilian community.

## II

▆ It has not escaped our notice that the trial counsel in his argument regarding an appropriate sentence, in part advised the court members that "it is proper and appropriate  .   .   . to consider the deterrent effect it will have on the community in which you live" and that deterrence to others is one of the "goals" that a jury has to consider in arriving at a sentence. A somewhat similar argument was condemned in *United States v. Mosely*, 24 U.S.C.M.A. 173, 51 C.M.R. 392, 1 M.J. 350 (1976). We will cure the error by reassessing the sentence.

## III

The other assigned errors have been considered. They do not, however, require discussion or corrective action by this Court.

The finding of guilty is affirmed. Reassessing the sentence in light of *Mosley, supra*, and the entire record, the Court affirms the sentence as approved by the convening authority.

Senior Judge COOK and Judge DeFORD concur.

▆

---

4.  *Black, supra*, at 24 U.S.C.M.A. 167, 51 C.M.R. 386, 1 M.J. 345.

5.  *United States v. McCarthy, supra*, 2 M.J. page 28.

6.  That servicemen and women have a deep and abiding interest in the protection and prompt receipt of their mail is a recitation of the obvious.