UNITED STATES, Appellee,

v.

Private (E-2) Keith B. TIMBERLAKE,
SSN 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, United States
Army, Appellant.

CM 432716.

U. S. Army Court of Military Review.

22 June 1977.

Colonel Alton H. Harvey, JAGC, Lieutenant Colonel James Kucera, JAGC, Captain Lawrence E. Wzorek, JAGC, and Captain Preston Wilson, JAGC, were on the pleadings for appellant.

Lieutenant Colonel Donald W. Hansen, JAGC, Lieutenant Colonel John T. Sherwood, Jr, JAGC, Captain John F. DePue, JAGC, and Captain John F. Schmutz, JAGC, were on the pleadings for appellee.

Before COOK, Senior Judge, and DRIBBEN and DeFORD, JJ.

## OPINION OF THE COURT

DeFORD, Judge:

The appellant was convicted by a military judge sitting as a general court-martial of possession and distribution of heroin, possession of drug paraphernalia and possession of marijuana in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.

The appellant among several assignments of error contends that the military judge committed error in that Specification 1, possession of heroin and Specification 2, distribution of heroin were not considered multiplicious for sentence purposes. He further contends that error was committed during the sentencing portion of his trial in that

DA Form 20B was introduced into evidence showing previous convictions which did not indicate such convictions had been subject to appellate review pursuant to regulation. We agree with the appellant's allegations for the reasons hereinafter set forth.

## I

■ The possession and distribution of heroin was the result of a single act and transaction in which the appellant for gain, purchased the heroin in question and distributed same to a Government informer.[1] As such, the offenses were multiplicious for sentencing purposes.

In addition, we note that the factual circumstances concerning these two specifications raise the spectre of a lack of jurisdiction under the mandates of *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) and *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). However, testing these factual circumstances against the well known *Relford* criteria and the required balancing thereof, we find there was sufficient on-post activity to warrant military jurisdiction in this case.[2]

## II

■ Following findings, the prosecution introduced into evidence without objection, the appellant's DA Form 20 with insert DA Form 20B which showed two previous convictions by summary and special courts-martial. In both instances, supervisory review was not indicated on the form.

Change 6, AR 27-10, dated 7 September 1971, which was in force at the time of appellant's trial, required entries in Items 53 and 54, Form 20B indicating supervisory review. In the case before us, such entries were not made and as the form indicated that supervisory review had not been accomplished it was incomplete on its face. As an official record, the form must be presumed to set forth truly and accurately all the information required by regulation on the particular subject.[3] Accordingly, the military judge erred in admitting DA Form 20B into evidence. Testing for prejudice, we believe the error was prejudicial to the substantial rights of the accused.

The remaining errors have been reviewed and are considered to be without merit or do not constitute any prejudice to the rights of the accused.

■ The findings of guilty are affirmed. Reassessing the sentence on the basis of the above-indicated errors and the entire record, the Court affirms only so much of the sentence as provides for a bad-conduct discharge, confinement at hard labor for 12 months, forfeiture of all pay and allowances, and reduction to the grade of Private E-1.

Judge DRIBBEN concurs.

COOK, Senior Judge, concurring and dissenting in part:

I concur with the majority in all but their disposition of the possession of drug paraphernalia and possession of marijuana charges. As to these two offenses, I would set aside the findings of guilty as, in my view, they are sustainable only on the basis of evidence obtained as the result of an illegal search.

On 15 July 1974, appellant's roommate, Ziser, reported to the Charge of Quarters (CQ) that his boxsprings, mattress and bedding had been stolen. The CQ reported the incident to the unit commander by telephone. He instructed the CQ to inspect the room to verify the report. The CQ com-

1. *United States v. Kleinhans*, 14 U.S.C.M.A. 496, 34 C.M.R. 276 (1964). *See also United States v. Smith*, 1 M.J. 260 (1976).

2. *See* this Court's previous opinions in *United States v. Fornash*, 2 M.J. 1045 (A.C.M.R.1976); *United States v. Sands* (A.C.M.R. 26 Nov. 1976); *United States v. Dunn* (A.C.M.R. 26 Nov. 1976); *United States v. Gelski* (A.C.M.R. 17 Dec. 1976).

3. *United States v. Heflin*, 23 U.S.C.M.A. 505, 50 C.M.R. 644, 1 M.J. 131 (1975) citing with approval *United States v. Engle*, 3 U.S.C.M.A. 41, 11 C.M.R. 41 (1953).

plied with the officer's instructions and then called him back stating that a marijuana cigarette had been discovered in an ash tray in the room and that Ziser had stated that he had observed the appellant smoking it earlier. The unit commander arrived at the company and inspected the cigarette and also was informed that Ziser had seen appellant smoking marijuana in the room on other occasions. Ziser did not state that he had ever seen appellant with a supply of marijuana. Apparently, based upon this information, as well as his desire to recover the missing bedding,* the commander conducted a search of appellant's wall locker. This search resulted in the disclosure of drug paraphernalia and marijuana.

It is obvious to me from my reading of the record that an unarticulated assumption used by the CO in arriving at his conclusion that appellant's wall locker probably contained marijuana was that marijuana smokers keep a cache of that substance on hand. I am unable to agree with that assumption. Secondly, even if I were able to concur in that conclusion, I cannot agree that the CO had any valid reason to believe that appellant's cache was stored in his wall locker. As the Court of Military Appeals has said:

". . . Although a soldier's room or locker are often likely places to conceal items he does not wish discovered, the Fourth Amendment requires more than the joinder of this likelihood with the suspicion that he has committed a crime to justify a search of these places in the hope that evidence or fruits of crime may be discovered there. . . . 'An official should have more reason for authorizing the search of a particular place than that the item to be searched for was possibly in that place.'" (Citations omitted) *United States v. Sam,* 22 U.S.C. M.A. 124, 130, 46 C.M.R. 124, 130 (1973).

It is axiomatic that "[a] search founded on mere suspicion is illegal and the fruits thereof inadmissible." *United States v. Gebhart,* 10 U.S.C.M.A. 606, 610, 28 C.M.R.

172, 176 (1959). Because, I find that the search of appellant's wall locker was bottomed on mere suspicion rather than the mandatory probable cause, (*see* paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition)), I would set aside the findings of guilty bottomed thereon.

## APPENDIX I

Testimony of the Unit Commander as it relates to basis for search.

"A. I got to the building and talked to Ziser and he confirmed what I had been told by the CQ. I talked to the CQ to find out a little bit more from him and I talked to the MP's and at this time, I decided with the fact that there was, you know, definitely some of my furniture missing, the fact that there had been a marijuana cigarette found in the ash tray and the fact that PFC Ziser had seen the man smoking marijuana previously in the room and had also seen him smoking this—supposedly, this particular marijuana cigarette, that I felt that I would go to the room and search the room. (R. 46).

\* \* \* \* \* \*

A. All right. Ziser told me that he had seen Private Timberlake smoking marijuana in the room before and that he had seen Timberlake smoking marijuana in the room that night and had put the marijuana cigarette in the ash tray.

Q. Could you be mistaken as to what Private Ziser told you?

A. No, I couldn't. Not on those two points I couldn't. I remember those because that was very important to me at that time whether, you know, as to just how I was to go about conducting the search, whether I would include drugs in on the search, or just—just my furniture that was missing. (R. 48).

\* \* \* \* \* \*

A. Okay. I went in the room and the MP's came with me and Private Zis-

---

* *See* Appendix 1 which contains pertinent extracts from the CO's testimony as to his "prob-

able cause" for searching appellant's wall locker.

er came with me and the CQ came with me and I went to—I searched Ziser's wall locker first because, more or less to balance—I wanted to check the credibility because sometimes people are mistaken, you know. In other words, I might find the tapes and I might find his bedding in there. Obviously the mattesss and the box springs, I don't expect to find in a wall locker, but —(R. 50).

\*     \*     \*     \*     \*     \*

A. All right. For that particular wall locker, I would think there were items there for the two—Number one, because, you know, basically, of course on Timberlake's—what he said to me, but also by the fact that my CQ found marijuana in the room and it was either going to be one of the two of them. I was 99 per cent sure that one of the two of them had put that marijuana cigarette in that ash tray. You know, very probable to me that one of the two of them had put that marijuana cigarette in that ash tray. You know, very probable to me that one of the two of them and being that one was already telling me the other was responsible. With the information that he gave me, I felt very strongly that this is where I would find the substance. (R. 53).

\*     \*     \*     \*     \*     \*

Q. If you didn't have this information as to the roach that was found in the waste can, if you just had the bare information that Timberlake used or recently smoked marijuana, that would have led you to believe there was marijuana in the wall locker?

A. If I would have just had somebody to just come up and tell me, 'Heh, I've seen somebody smoking marijuana,' I'd probably—I wouldn't, probably, search the guy's wall locker. I probably wouldn't because, I think, when you get down to it, basically, many of the people in the building have probably smoked marijuana at one time or another, you know. But the thing, of course, initially, was I was concerned with the loss of property which amounted to over $100 and then with this information on the marijuana cigarettes sitting right there in front of me, I felt very strongly that this was, you know, I was going to find it and that also, you never know, it could be tied in. Often times thefts are drug related, you know, and there is always that possibility. So I felt it was my duty to try and, you know, dig into this thing as deep as I could in both ways.

Q. You were also in looking for the missing bedding?

A. Yes, I was. Right.

Q. In the wall locker?

A. Right. I was doing both when I searched Timberlake's wall locker. If I'm not—They were Timberlake's tapes that were reported missing, also. (R. 54–55).

\*     \*     \*     \*     \*     \*

Q. Did Ziser in any way indicate to you where Private Timberlake kept this marijuana that he smoked in the room?

A. No, he didn't.

Q. What made you think you might find some marijuana or anything in Private Timberlake's locker that he shouldn't have there?

A. Well, I figured that if I would find it, it would be in the locker or in his drawers and it just—there's really not much place else in that room where you could place anything like—you know. There's a wall locker and there's the drawers and those are the only two places where you can put even—put anything, unless you just sat it out in the open, you know, on the table, on the bed, or something like that.

Q. What made you believe he kept it somewhere in the room rather than on his person?

A. Well, you wouldn't know that for sure either, really, but I would just, again, have to assume that just logically thinking, that's where I would find it.

Q. Now, what if any, reason did you have to believe that any of these reportedly stolen items might be found in Timberlake's locker?

A. Well, you know, there, again, it's just a lot of times when something is missing from a room, you know—again, very often, you find those items either misplaced in that room or stolen by, you know,—not stolen, maybe, but sometimes just borrowed and a misunderstanding, but it seems to me that I very possibly could have found, at least, the bedding and the tapes in either wall locker—just there by accident if nothing else. But I have to begin my search somewhere for these—In other words, I have to—

Q. All right.

A. —start with that room—

Q. You've answered my question.

A. Okay." (R. 58–59).