**UNITED STATES, Appellee,**

v.

**Harry F. MOORE, Jr., Airman First Class, U. S. Air Force, Appellant.**

**No. 31,176.**

U. S. Court of Military Appeals.

July 16, 1976.

*Major Byron D. Baur* argued the cause for Appellant, Accused. With him on the brief was *Colonel Jerry E. Conner.*

*Colonel Julius C. Ullerich, Jr.* argued the cause for Appellee, United States. With him on the brief was *Captain Frederick P. Waite.*

## OPINION OF THE COURT

FLETCHER, Chief Judge:

Failing to return to the correctional custody[1] facility following an unescorted visit to "sick call," Airman Moore devised a scheme at his off-base residence to fake his own drowning to avoid further military service. Assisted by his wife and a fellow airman named White, the accused additionally conspired to collect $20,000 under the accidental death provisions of the Serviceman's Group Life Insurance program[2] by falsely reporting the drowning incident. As a result of the false report, the accused's wife also received a "death-gratuity" out of Air Force appropriated funds. *See* 10 U.S.C. §§ 1475–80 (1975); AFM 300–4, Data Automation, Volume X—Comptroller, Appendix O (Apr. 1, 1974).

Convicted of attempted larceny and conspiracy to steal $20,000, larceny of the death gratuity in the amount of $2,266.20, as well as breach of restraint and desertion, Airman Moore now challenges the jurisdiction of the court-martial which tried him contending that the attempted larceny, conspiracy, and larceny offenses were not service connected. *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); *see Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). *See also Gosa v. Mayden,* 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973).

Appellant's jurisdictional attack focuses principally upon the off-base situs of the conspirators when their scheme was devised and implemented. More importantly, appellant suggests that this Court's prior decisions interpreting *O'Callahan* have placed undue influence on the status of the victim in resolving the "service-connection" issue. *See, e. g., United States v. Everson,* 19 U.S.C.M.A. 70, 41 C.M.R. 70 (1969); *United States v. Huff,* 19 U.S.C.M.A. 56, 41 C.M.R.

56 (1969); *United States v. Nichols,* 19 U.S. C.M.A. 43, 41 C.M.R. 43 (1969); *United States v. Plamondon,* 19 U.S.C.M.A. 22, 41 C.M.R. 22 (1969); *United States v. Comacho,* 19 U.S.C.M.A. 11, 41 C.M.R. 11 (1969); *United States v. Rego,* 19 U.S.C.M.A. 9, 41 C.M.R. 9 (1969). The thrust of these decisions was summarized by Judge Ferguson in *United States v. Everson, supra* at 71, 41 C.M.R. at 71:

> [W]here an offense cognizable under the Code is perpetrated against the person or property of another serviceman, regardless of the circumstances, the offense is cognizable by court-martial.

With the exception of *Rainville v. Lee,* 22 U.S.C.M.A. 464, 47 C.M.R. 554 (1973),[3] the decisions of this Court, which elevated the victim's status to the level of all-determinative on the question of service connection, predated the Supreme Court's opinion in *Relford v. Commandant, supra,* which enumerated the following criteria for resolving the military jurisdiction issue:[4]

1. The serviceman's proper absence from the base.
2. The crime's commission away from the base.
3. Its commission at a place not under military control.
4. Its commission within our territorial limits and not in an occupied zone of a foreign country.
5. Its commission in peacetime and its being unrelated to authority stemming from the war power.
6. The absence of any connection between the defendant's military duties and the crime.
7. The victim's not being engaged in the performance of any duty relating to the military.
8. The presence and availability of a civilian court in which the case can be prosecuted.

---

1. "Correctional custody is the physical restraint of a person . . . imposed as a punishment under Article 15." Paragraph 131*c* (4), Manual for Courts-Martial, United States, 1969 (Rev.).

2. *See* 38 U.S.C. §§ 765–76 (1976).

3. *See also United States v. Sexton,* 23 U.S.C. M.A. 101, 103, 48 C.M.R. 662, 664 (1974) (Duncan, C. J., concurring in the result).

4. *Relford v. Commandant,* 401 U.S. 355, 365, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

9. The absence of any flouting of military authority.
10. The absence of any threat to a military post.
11. The absence of any violation of military property.
12. The offense's being among those traditionally prosecuted in civilian courts.

The Supreme Court in *Relford* also stressed: [5]

(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave. . . (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order. . . . (c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission. (d) The conviction that Art. I, § 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman-offender and turn him over to the civil authorities. . . . (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community. . . . (f) The very positive implication in *O'Callahan* itself . . . that the presence of factors such as geographical and military relationships have important contrary significance. (g) The recognition in *O'Callahan* that, historically, a crime against a person of one associated with the post was subject even to the General Article. . . . (h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law. (i) [An] . . . inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post.

■ What *Relford* makes clear is the need for a detailed, thorough analysis of the jurisdictional criteria enunciated to resolve the service-connection issue in all cases tried by court-martial. A more simplistic formula, while perhaps desirable, was not deemed constitutionally appropriate by the Supreme Court. It no longer is within our province to formulate such a test.

*Relford* did, however, carve out a more workable standard for a limited number of cases in which "a serviceman is charged with an offense committed within or at the geographical boundary of a military post and violative of the security of a person or of property there," holding that such offenses always were triable by court-martial. 401 U.S. at 369. Yet, that language by omission suggests that there may be instances in which a crime committed off post against a fellow servicemember or the service itself is *not* triable by court-martial applying the more detailed criteria previously outlined.

■ With that brief summary of the state of the law, we turn to the facts presented. The trial transcript reflects that, after Airman White reported the accused's drowning to civilian authorities, the accused's wife was contacted the following day at her off-base residence by the casualty assistance representative for Travis Air Force Base. Mrs. Moore was given a death gratuity check in the amount of $2,266.20 after she signed a claim form which was witnessed by Airman White's wife. Several weeks later, the same official escorted the accused's wife to the local social security office where she completed the necessary Veterans Administration forms to receive SGLI benefits.

---

**5.** Id. at 367–69, 91 S.Ct. 649 (footnotes omitted).

The SGLI program was established by Congress solely for the benefit of servicemen. Benefits presently are paid by the Prudential Life Insurance Company out of premiums collected from individual servicemembers under a collection plan specified in 38 U.S.C. § 769 (1976). Both the Department of Defense and the Veterans Administration aid claimants in preparing and forwarding claims under the program. At least in the Air Force, casualty affairs officers are utilized to administer the SGLI operation as well as death gratuity disbursements. *See generally* Air Force Regulation 30–25, "Casualty Affairs" (Feb. 24, 1974).

Perhaps most significant in resolving the service-connection question here is the fact that the accused's military status, and that status alone, enabled Airman Moore to devise and implement his criminal scheme. Prior to *Relford,* Judge Darden observed in *United States v. Fryman,* 19 U.S.C.M.A. 71, 73, 41 C.M.R. 71, 73 (1969) that "the positive misuse of . . . [military] status to secure privileges or recognition not accorded others causes the armed forces to have a substantial interest in punishing the abuse."

The abuse of military status in this instance triggered a number of the *Relford* factors weighing in favor of military jurisdiction. In addition to involving a fellow airman in the conspiracy, the accused's plan was directly related to his military duties in several respects. The drowning scheme initially was devised to avoid further military service. The criminal enterprise also sought to capitalize on monetary benefits available only to deceased servicemen. Even though the SGLI benefits were to be paid by a private corporation, the program is implemented primarily by the armed services and is funded by premiums paid solely by fellow servicemembers. Similarly, the death gratuity was paid entirely out of Air Force appropriated funds. Thus, factors 6, 7, and 11 enunciated in *Relford* weigh heavily in favor of trial by court-martial.

Factors 1 through 5, 8, and 12 all concern the effect of a crime's commission off base and are matters to be weighed in determining "whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts." *Schlesinger v. Councilman,* 420 U.S. 738, 760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975). As already mentioned, the instant offenses, even though committed off base, impacted upon statutory programs of primarily military interest, the life insurance and death gratuity programs for servicemen. Thus, the military interests here were not only distinct but virtually exclusive. Even though a civilian insurance company arguably could have become a "victim" had the larceny scheme proved successful, it must be recalled that Prudential's disbursements are recovered through premiums paid exclusively by servicemen. We conclude, therefore, that the military society's interests far outweighed those of the civilian community in this instance, and the offenses properly were triable by court-martial.

The decision of the United States Air Force Court of Military Review is affirmed.

Judge PERRY concurs.

COOK, Judge (concurring):

I construe *Relford's*[1] exegesis of *O'Callahan's*[2] criteria for the exercise of court-martial jurisdiction more broadly than the majority. In my opinion, the Supreme Court perceived not only the military situs of the commission of an offense as justification for court-martial jurisdiction, but also the existence of a military relationship between the accused and the victim of his crime. *See* 401 U.S. at 368, 91 S.Ct. 649. Consequently, in my judgment, *Relford* confirmed the decisional importance this Court placed on the fact that both the accused and the victim were members of the armed forces.

1. *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

2. *O'Callahan v. Parker,* 395 U.S. 258, 23 L.Ed.2d 291, 89 S.Ct. 1683 (1969).

As to the merits, I agree with the majority that the circumstances of the conception and commission of the offenses invest them with such service significance as to justify the exercise of court-martial jurisdiction.