UNITED STATES

v.

Patrick J. BLAKE, 209 44 1132, Corporal (E–4), U. S. Marine Corps.

NCM 78 0573.

U. S. Navy Court of Military Review.

Sentence Adjudged 17 Nov. 1977.

Decided 24 Nov. 1978.

CAPT Joseph F. Smith, USMCR, Appellate Defense Counsel.

CAPT John P. Hertel, USMC, Appellate Government Counsel.

Before DUNBAR, Senior Judge, and FERRELL and MICHEL, JJ.

MICHEL, Judge:

Contrary to his pleas, appellant was convicted at a special court-martial bench trial of possession, sale, and transfer[1] of 328

---

1. This traditional trilogy of offenses was pled in three specifications under a single charge; except for the individual action allegation, the following specification is representative of all:

Specification 1: In that Corporal Patrick J. BLAKE, U.S. Marine Corps, Wing Engineer Squadron 37 Marine Wing Support Group 37, 3rd Marine Aircraft Wing, Fleet Marine Force, Pacific, Marine Corps Air Station, El Toro, Santa Ana, California, a person subject to the jurisdiction of the U.S. Marine Corps under Article 2, UCMJ, 10 U.S.C. § 802, by virtue of a valid enlistment contract signed by him on 20 September 1974, for a period of four years, did, at 6504 Trabuco Road, the parking lot of Peyton's Place Bar, on or about

grams, more or less, of marijuana in violation of Article 1151, U.S. Navy Regulations, 1973, the same being in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892. His sentence, extending to a bad-conduct discharge, vests appellate jurisdiction in this Court. *See* Article 66(b), UCMJ, 10 U.S.C. § 866(b).

Appellant now complains, as he did in the trial court, that the specifications under the charge fail to specify facts sufficient to show that the three alleged offenses were service-connected, thus negating the subject-matter jurisdiction of the court-martial, or, assuming the pleadings to be sufficient and proper, that the facts fail to establish such service connection. We disagree and affirm.

## I

The instant appeal brings into sharp focus the problematic results of the Court of Military Appeals' decision in *United States v. Alef,* 3 M.J. 414 (C.M.A.1977). There the Court granted the petition for review to consider whether Sergeant Alef's court-martial lacked jurisdiction to try the simultaneous offenses of off-post sale and possession of a prohibited, controlled substance. In their decision, our judicial superiors took as a point of departure the requirement that "service-connection", if established at all, must be determined by the application of criteria designed to resolve questions of subject-matter jurisdiction.[2] The majority then indicated the necessity of an *ad hoc* approach within the " . . . analytical process [frame-work] of carefully balancing the *Relford* criteria to determine whether the military interest in deterring the offense is distinct from and greater than that of the civilian jurisdiction, as well as whether this distinct military interest can be vindicated adequately in the civilian courts."[3] Applying the criteria to Sergeant Alef's case, the Court then went on to find no subject matter jurisdictional base for the Government's case and, therefore, voided Alef's conviction. Had that Court stopped there, we would not find ourselves at the present juncture.

In Part II of its *Alef* opinion, the Court chose, through dicta and judicial legerdemain, to remedy what it saw as deficient counsel expertise and performance in the realm of trial court motion practice, which, in the final analysis, adversely impacted upon that Court's ability to effectively deal with military jurisdictional issues on appeal.[4] To cure the evil, as the Court saw it, resort was had to the expedient of ostensibly dealing a death blow to a method of military criminal law pleading, which had been firmly established for over a quarter century,[5] and, in the wake of its action,

1 September 1977, violate a lawful general regulation, to wit: Article 1151.2, U.S Navy Regulations, dated 26 February 1973, by wrongfully possessing 328 grams, more or less, of marijuana, an offense cognizable by military court-martial, in that the offense is service connected because: it took place just outside the military installation boundary; of the connection between the defendant's military duties and the crime; a flouting of military authority; and this is an offense traditionally prosecuted by a military court.

2. The Court relied on these criteria, as set forth in the Supreme Court decision of *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), and as applied in *United States v. Moore,* 1 M.J. 448, 450 (C.M.A.1976) where the Court stressed that:

What *Relford* makes clear is the need for a detailed, thorough analysis of the jurisdictional criteria enunciated to resolve the service-connection issue in all cases tried by court-martial. A more simplistic formula,

while perhaps desirable, was not deemed constitutionally appropriate by the Supreme Court. It no longer is within our province to formulate such a test.

3. *Alef, supra* at 416, *citing United States v. Hedlund,* 3 M.J. 162 (C.M.A.1976).

4. *See Alef, supra* at 418–419.

5. It is noted that one jurist anticipated the end result of the Court's action. *See Alef, supra* at 421 (Cook, J., dissenting). The precise evil comprehended by Judge Cook lurks within the case at bar. As noted by Judge Cook, the procedure required by the *Alef* majority is mandated neither by the UCMJ, the MCM, 1969 (Rev.), nor by Presidential prescription as authorized under Article 36, Uniform Code of Military Justice, 10 U.S.C. § 836. We note too that the model specifications in Appendix 6c, MCM, 1969 (Rev.), are the direct descendents of their 1951 counterparts and, as such, are

leaving nothing but a vacuum.[6] It is clear that the majority intended a broad-brush result which would be all pervasive, irrespective of person, offense, or situs.[7] One may only speculate as to the necessity for the cure when the factual context of *Alef* reflected precious little ill.[8]

■ It is clear that what the Court in *Alef* was seeking to achieve was the *full* development in the trial forum of the *factual* underpinnings of all motions presented for resolution and the preservation of these factual matters *in the record* for appellate purposes.[9] While the Court enunciated a prospective mandatory rule which it deemed to effectuate "the better practice," [10] it concomitantly issued an alternative procedural approach:

> Defense counsel may, of course, always as a preliminary matter challenge the indictment as being too uncertain or vague utilizing a motion for a Bill of Particulars. Counsel who wish to challenge the sufficiency of a charge to allege military jurisdiction should do so by a motion to quash, demonstrating in what particulars the charge fails to allege facts sufficient to demonstrate "service connection".

Counsel desiring to challenge the factual accuracy of the allegations regarding jurisdiction also should move to quash the charge, accompanying the motion with specific evidence to rebut the facts alleged in the indictment.

*Alef, supra* at 419 n.18. We view this alternative approach as the vehicle for remedy when trial defense counsel views the pleadings as insufficient to put him and his client ". . . on notice of what jurisdictional basis, if any, the government is urging . . .." [11] This approach was attempted, in part, by the trial defense counsel in the case at bar, although obviously without success.[12]

■ Perusal of appellant's trial motion to quash reveals that, through counsel, appellant attempted to follow the dictates of the majority in *Alef*.[13] Defense counsel did not challenge the specifications as being too uncertain or vague as no motion was made for a Bill of Particulars; rather the sufficiency of the allegations to allege military jurisdiction was challenged by the motion to quash. It was here that that advocate's effort fell short of the mark. While *Alef* requires that such a motion demonstrate

viable modes of pleading, even in the wake of landmark decisions by our Highest Court. *See* para. 28, MCM, 1969 (Rev.) and *United States v. Marshall*, 18 U.S.C.M.A 426, 40 C.M.R 138 (1969), which comport with the modern preference for simplistic pleading in criminal cases. *See* Fed.R.Crim.P. 3 and 7(c). True it is that when the Supreme Court decided *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) and *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), jurisdictional lines were drawn, but nowhere in those opinions or their progeny, can be found even so much as a hint of displeasure, discontent, or disagreement with the established manner of pleading the allegations of military offenses, save those enunciated by the Court in *Alef*. Thus, we view *Alef's* gratuitous mandate as a departure from the norm to be followed by the pleader at his peril.

**6.** The temptation to formulate pleading guidelines which would appear to satisfy the *Alef* mandate is great; however, we decline, being of the view that proper resolution of the problem reposes on a higher plane.

**7.** *See Alef, supra* at 419 n.17 and 421 (Perry, J., concurring).

**8.** At trial, counsel and the accused entered into an extensive stipulation of fact which was accepted by the trial judge and inevitably utilized by him, along with other evidence, in deciding the jurisdictional issue against the accused. *See Alef, supra* at 416–417 n.6 and 419–420 app.

**9.** *See Alef, supra* 416 n.6, 418–419.

**10.** *Id.*

**11.** *Id.*

**12.** Following arraignment, individual military counsel presented the jurisdictional motion in written form. This document, set forth in Appendix A to this opinion, was admitted as an appellate exhibit and apparently considered by the military judge prior to his entering of special findings in the case, such special findings being set forth in Appendix B, *infra*.

**13.** It could be added that this was done in the same way that the pleader attempted to follow the Court's mandate with respect to formulating judicially acceptable specifications. *See* n.1, *supra*.

" . . . in what particulars the charge fails to allege *facts* sufficient to demonstrate 'service connection' " (*Alef, supra* at 419 n.18 [emphasis supplied]), counsel simply has not done this; neither has he accompanied his motion to quash " . . . with specific *evidence* to rebut the facts alleged in the indictment" (*id.*), in his effort to challenge the factual accuracy of the allegations regarding jurisdiction. In short, what he has done is that which he postulates is his opposing counsel's error: the presentation of legal conclusions instead of facts.

At trial the military judge, evidently eschewing evidentiary repetition, chose to hear the case on the merits, reserving his ruling on the defense motion until all the evidence and argument had been presented by both sides. As it bears on the issue of subject matter jurisdiction, this evidence is summarized as follows:

The principal witness against the appellant at trial was CPL R. He testified that he had known appellant for about two years, the acquaintance being first made when the two enlisted Marines had been stationed and had worked together at the same unit in Japan. Their association was renewed upon their individual reassignment to the same air station in California, approximately one week prior to the events which formed the basis for appellant's convictions in this case. During this latter time frame, CPL R was acting as an informant for both CID and NIS, having contacted individuals from both investigative bodies some 4 to 6 weeks prior to appellant's return to the United States.

CPL R related that he met the appellant four times on base, including the date of the allegations at issue here, and on the second of these occasions CPL R, to whom appellant was known as a marijuana user, broached the subject of drugs with appellant. This conversation took place inside the enlisted club at the Marine Corps Air Station where both individuals worked. Responding to CPL R's inquiry concerning a drug source, appellant indicated that he had a "brother with a big connection", that appellant had been selling for about 6 months, and that therefore supplying CPL R with drugs would not pose any significant problem.

Five days later, again at the enlisted club, the two Marines met and CPL R was told by appellant that the latter could supply twelve ounces of marijuana the following day, the cost to CPL R being $375.00. Appellant also told CPL R that he, appellant, would contact CPL R when the prohibited substance was in his possession. This contact occurred early the next evening in appellant's berthing space in the enlisted barracks at the air station. At this time appellant informed the prospective buyer that the source was "running late" and that the two Marines should meet later at a commercial establishment, frequented by many base personnel, just outside the main gate of the Marine installation.[14]

Subsequent to this encounter, CPL R contacted his investigatory superiors and what is known in common parlance as a "controlled buy" was set up.[15] Some four hours later, CPL R met appellant in the parking lot of the previously designated commercial establishment.[16] After inconsequential initial discourse, appellant gave CPL R a

---

**14.** It would not be unreasonable to assume that, since the time of this conversation was after normal working hours and appellant's "connection" was a civilian, appellant anticipated complications attendant to this individual's entry onto the military post and opted instead for a transaction situs just short of the military boundary and its concomitant requirement for a gate pass. There is also evidence of record indicating that appellant "was nervous about dealing on base," such apprehension attributable to prior barracks searches.

**15.** CPL R was searched by the professional investigators to ensure the absence of prohibited substances, and then given a car and a quantity of "marked money" with which to complete the transaction.

**16.** The record establishes that this meeting took place at a point some two hundred yards outside the main gate of the Marine Corps Air Station, well within view of the NIS agents who observed the entire transaction from a vantage point *inside* the base.

brown paper bag containing twelve clear plastic bags which appeared to contain marijuana; in return, CPL R handed over to appellant the money which he had previously received for the precise purpose of completing the transaction. As might be anticipated, appellant's apprehension was effected on the spot shortly thereafter. The trial defense team offered no substantial, relevant rebuttal evidence,[17] opting instead mainly to cross-examine prosecution witnesses and thereafter arguing, in essence, that position indicated in their written brief.

As we noted above, the Court of Military Appeals has enunciated a mandatory rule of practice and procedure respecting formal military criminal allegations. That Court formulated its then new requirement in all-expansive language, the intendment aimed at what the Court viewed as defective military motion practice.[18] What that Court obviously hoped to achieve by way of the vehicle which it created was the instigation and perpetuation of full and complete evidentiary trial hearings which would adequately frame issues for intelligent appellate tribunal disposition.[19] This was what was done in this case. Appellant now asks us to elevate form over substance and set his conviction aside. However, we decline to do so on the premise that the purpose of the rule having been justly served, we will not countenance the injustice which would surely flow from the present application of a *per se* rule.

## II

Having found a sufficient predicate for the subject matter jurisdictional question in this case, we turn now to an examination of the facts in an effort to ascertain whether or not that jurisdiction existed in the trial court. We are aided in this endeavor by the procedure heretofore supplied to us.

In *United States v. McCarthy*,[20] twelve criteria were re-emphasized for the determination of the issue of subject matter jurisdiction:

1. The serviceman's proper absence from the base.

2. The crime's commission away from the base.

3. Its commission at a place not under military control.

4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

6. The absence of any connection between the defendant's military duties and the crime.

7. The victim's not being engaged in the performance of any duty relating to the military.

8. The presence and availability of a civilian court in which the case can be prosecuted.

9. The absence of any flouting of military authority.

10. The absence of any threat to a military post.

11. The absence of any violation of military property.

.  .  .  .  .

12. The offense's being among those traditionally prosecuted in civilian courts.[21]

Armed with this formidable array of considerations, we will attempt to arrive at our

---

**17.** This evidence consisted of the testimony of appellant's sister to the effect that it was her idea, rather than that of appellant's, that the marijuana sale be consummated with CPL R on the evening in question.

**18.** *See* note 9, *supra,* and accompanying text.

**19.** We note that while the Court prescribed what shall be done, it declined to provide a remedy for non-compliance; since we perceive no prejudice to appellant, we deign not to fashion such a remedy nor describe acceptable parameters for its application.

**20.** 2 M.J. 26 (C.M.A.1976).

**21.** *Id.* at 27–28, *quoting United States v. Hedlund,* 2 M.J. 11 (C.M.A.1976), which drew substance from both *Relford* and *O'Callahan,* both *supra.*

conclusion by that methodology prescribed for us.[22]

■ At the outset, certain of the above criteria clearly weigh against military jurisdiction. Succinctly, as to the charged offenses in this case, both appellant and CPL R were properly absent from the Marine Corps Air Station at the time that the alleged marijuana sale was consummated; the situs of the consummating event was not within the confines of the military installation, but rather within the civilian community and thus outside military control; the final event which gave rise to the allegations was completed within the confines of the United States during peacetime; neither CPL R nor appellant was engaged in the performance of any military duty at the time of the terminal event; this final event did not violate military property; the drug-related offenses were among those traditionally prosecuted in civilian courts; and such courts were open and available for appellant's prosecution. At first blush then it would appear that both appellant and CPL R had blended into the civilian community and, thus, military jurisdiction can not be sustained. [23]

But that is only half the picture. The facts reveal that CPL R's association with appellant was formulated and fostered in large measure due to their mutual military assignment and duties in the Far East. That association was resurrected, again, due solely to the military duty assignment of both individuals. Thus, it can be said that the background against which the alleged criminal acts of appellant are set is one created and preserved by their common military membership. Further, each time in the scenario that CPL R met appellant, the meeting took place on board their military post. This included their initial meeting, two subsequent meetings at the enlisted club, and the final on-base meeting—this

time in appellant's berthing area in the barracks. It should be remembered also that the entire scheme, save the final culminating event, was formulated within the confines of a military installation. Plainly then, it would not be erroneous to conclude that there was an on-post formation of the criminal intent respecting a technically "off-base" offense.[24]

We examine further. The evidence is clear that appellant knew of the law enforcement efforts which were ongoing as respects on-base drug offenses. He knew that barracks and other searches had been completed and he made the conscious choice to conclude his illicit activity in a locale which he viewed as being immune from military interference. Yet, he opted for a location which was apparently convenient to himself, his "connection", and CPL R. That location was both within sight of the military base and at a place frequented by large numbers of military personnel engaging in off-duty pursuits. With these factors involved, one of reasonable intelligence would be hard pressed to conclude that there was nothing other than a flagrant flouting of military authority. Appellant, in this case, chose to conduct his unlawful business literally right under the noses of those who were charged with a duty to apprehend offenders like himself, and would have us believe that a mere geographical boundary should shield him from the predictable result. In this, he is mistaken.[25]

In our view, appellant's criminal conduct posed a distinct threat to his military post. His dealing in a prohibited commodity took place at an adjacent locale which was frequented by large numbers of off-duty base personnel. The transaction could have been viewed by any one of these individuals, creating the impression that similar criminal conduct could be engaged in at or near

22. *Cf., United States v. Moore,* 1 M.J. 448 (C.M. A.1976).

23. *Cf., United States v. McCarthy, supra,* at 29.

24. *See id. See also United States v. Hedlund, supra* at 14–15.

25. *Cf. United States v. Cruz,* 5 M.J. 286, 287 (C.M.A.1978).

that place with impunity. To compound the situation, appellant knew that CPL R would be returning to the base immediately with the cache of marijuana; considering the amount involved, it would seem fairly obvious that at least portions of the cache would ultimately find their way to fellow Marines on duty at the air station. This being the case, we are convinced that the military community had an extensive, overriding interest in prosecuting appellant for his misdeeds.[26]

One final item deserves mention. We conceded earlier that the offenses committed by appellant were among those traditionally prosecuted in civilian courts. That point notwithstanding, we would go on record as observing that appellant was charged with and convicted of violations of Article 92, UCMJ.[27] Whatever else that article might contemplate as being within the pale of its proscription, it includes the gravamen of appellant's misdeeds which is an *orders* violation. The drafters of the Code clearly recognized the importance of adherence to, and compliance with, lawful orders by military personnel[28], and the inimical impact upon good order and discipline, morale, and mission effectiveness when those orders are not obeyed. Their wisdom and intent should neither be displaced nor adulterated by postulating that the military interest in deterring such offenses neither is distinct from nor greater than that of the civilian community and therefore best vindicated in a civilian forum.[29]

On balance[30], then, we conclude that resolution of the competing jurisdictional criteria of record in this case compels the issue of service connection[31] and the attendant question of satisfaction of jurisdictional requirements to be resolved against appellant.

---

**26.** *Cf. United States v. McCarthy, supra.*

**27.** 10 U.S.C. § 892.

**28.** While the Code recognizes two general classes of orders violations, appellant's transgressions were of the more significant variety. *See* Article 92 UCMJ; MCM, 1969 (Rev.), paras. 171 and 127c.

The remaining assignment of error lacks merit.

Accordingly, the finding and sentence, as modified below, are affirmed.

Senior Judge DUNBAR and Judge FERRELL concur.

## APPENDIX A

## SPECIAL COURT–MARTIAL

### MOTION TO QUASH

Defendant, PATRICK J. BLAKE, hereby moves this Court-Martial to quash the charges which serve as the basis for the convening of this Court-Martial and dismiss said charges against the defendant for the following reasons:

1. The specifications of the charges do not allege facts sufficient to give this Court-Martial jurisdiction to try the defendant in that a sufficient service connection has not been alleged, and in the alternative,

2. If the charges are found to be sufficient as alleged to give this Court-Martial jurisdiction, the facts are inaccurate; the true facts showing that there is insufficient service connection to the conduct charged to give this Court-Martial jurisdiction.

Defendant submits this motion, points and authorities in support thereof, together with any evidence and arguement (sic) at the hearing hereof to request dismissal of all charges that are now the subject of this Court-Martial.

Wherefore, the defendant, PATRICK J. BLAKE, [prays] that all charges now pending before this Court-Martial against him be dismissed.

---

**29.** *Cf., Schlesinger v. Councilman,* 420 U.S. 738, 760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975).

**30.** *See United States v. Moore, supra* at 450.

**31.** *See Relford* and *O'Callahan,* both *supra.*

POINTS AND AUTHORITIES

THE PROSECUTION IN A MILITARY CASE MUST PRESENT SWORN CHARGES WHICH, ON THEIR FACE, SET FORTH SUFFICIENT FACTS TO DEMONSTRATE THAT A BALANCING OF THE "RELFORD" CRITERIA WILL WEIGH IN FAVOR OF JURISDICTION OVER THE GIVEN DEFENDANT AND HIS ACTS IN A MILITARY TRIBUNAL.

The U.S. Court of Military Appeals sets forth the above standard in *U. S. v. Alef* (1977) 3 M.J. 414, 418.

The U.S. Supreme Court sets forth the "*Relford*" criteria in *Relford v. Commandant* (1971) 401 U.S. 355, 91 S.Ct. 649, 655, 28 L.Ed.2d 102. These criteria are as follows:

1. The serviceman's proper absence from the base.

2. The crime's commission away from the base.

3. Its commission at a place not under military control.

4. Its commission within our territorial limits and not in an occupied zone of a foreign country.

5. Its commission in peacetime and its being unrelated to authority stemming from the war power.

6. The absence of any connection between the defendant's military duties and the crime.

7. The victim's not being engaged in the performance of any duty relating to the military.

8. The presence and availability of a civilian court in which the case can be prosecuted.

9. The absence of any flouting of military authority.

10. The absence of any threat to a military post.

11. The absence of any violation of military property.

12. The offense's being among those traditionally prosecuted in civilian courts.

II

THE COURT–MARTIAL MUST BE LIMITED TO THE LEAST POSSIBLE POWER ADEQUATE TO THE END PROPOSED.

" . . . it is stated that the Court in *O'Callahan* recognized that a court-martial 'remains to a signifigant (sic) degree a specialized part of the overall mechanism by which military discipline is preserved,' . . . that military courts, of necessity, are not impartial weighers of justice, but have as their primary consideration the enforcement of the unique discipline required of a fighting force; and that, as a consequence, the court-martial must be limited to the 'least possible power adequate to the end proposed.' " *Relford v. Commandant* (1971) 401 U.S. 355, 363, 91 S.Ct. 649, 654, 28 L.Ed.2d 102.

III

UPON EXAMINATION OF THE RELFORD FACTORS IT MUST BE FOUND THAT THE MILITARY INTEREST IS DISTINCT FROM AND GREATER THAN THAT OF CIVILIAN SOCIETY AND THE DISTINCT MILITARY INTEREST CANNOT BE ADEQUATELY VINDICATED IN CIVILIAN COURTS.

"Merely because the recipient of the contraband was a soldier is insufficient, in and of itself, to establish service connection. (Citations omitted) The issue requires careful balancing of the *Relford* factors to determine 'whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and whether the distinct military interest can be vindicated adequately in civilian courts.' " (Citation omitted) *U. S. v. McCarthy* (1976), 2 M.J. 26, 25 U.S.C.M.A. 30, 54 C.M.R. 30.

The prosecution has alleged in the charge sheet before this Court-Martial the following four reasons for service connection:

1. (The offense) "took place just outside the military installation boundary;"

This is not a fact that is within the *Relford* criteria as it is alleged on the charge sheet. In *U. S. v. McCarthy* (1976), supra, the Court notes that the drug transfer took place just outside a gate to the post. However, in discussing the *Relford* factors that served to give the military jurisdiction (sic) contained no mention of the crime being committed on the base or at its border, *McCarthy* [2 M.J. p. 29, 25 U.S.C.M.A.] at p. 35 [54 C.M.R. p. 35]. In fact the Court stated: " . . . the *Relford* criteria leads us to conclude that the four factors weighing in favor of military jurisdiction . . . ", [2 M.J. p. 29, 25 U.S.C.M.A.] p. 35 [54 C.M.R. p. 35] *McCarthy.* This statement together with the four factors enuciated (sic) (They were: Formation of intent on-post; connection between defendant's duties and the crime; threat to military personnel; and the transforee (sic) was engaged in military duties at the time the agreement was reached.) clearly shows that the *McCarthy* Court did not consider just outside the base to be "on the base" within the meaning of *Relford.*
2. " . . . this is an offense traditionally prosecuted by a military court." This is an incorrect statement of the *Relford* factor as stated. The twelfth *Relford* factor is the offense's being among those traditionally prosecuted in civilian courts. In *U. S. v. Alef,* supra, it was found that an off post drug sale is one that is traditionally prosecuted by the civilian courts in their finding (1) an off post drug sale and (2) all twelve *Relford* factors weigh against military jurisdiction [401 U.S.] p. 416 and p. 416 n.6 [91 S.Ct. 649]. This criteria must be examined from the civilian rather than military standpoint. Both the wording of the factor as stated in *Relford* and the policy of limiting military jurisdiction (See point II herein, p. 3) require this.
This leaves two factors that as alleged do allege the ultimate facts of two of the *Relford* criteria. However, the allegation of "a flouting of military authority" would appaer (sic) to be insufficient on the basis of the *Alef* decision, supra, p. 417 n.11 and

8. Therein the U.S. Court of Military Appeals held that just the fact of regulations existing prohibiting various drug activities is not enough to constitute a flouting of military authority. The factor must be established not generalized. The facts of this case will show there has been no flouting of military authority within *Relford.*

The same applies to the remaining jurisdictional allegation. *Alef* at page 417, note 8 specifically deals with the final specification of "connection between the defendant's military duties and the crime;", *Alef,* supra. The facts will also show that there *in fact* no connection (sic) between the crime and defendant's military duties.

## SUMMARY

The prosecution has presented a charge sheet which on its face alleges only two valid criteria for consideration of jurisdiction under *Relford.* They are: that the crime and the defendant's military duties are connected and that there was a flouting of military authority.

With the rejection of the "commuter" theory in *Alef,* supra, p. 418, note 12, and the *Mc Carthy* ruling on a transaction just outside a boundary of a military case the first part of the prosecution's service connection specification is rendered to be of no use in securing military jurisdiction for this case. Also, the wording of the final part of the service connection specification and *Alef,* supra, give it no import in the jurisdiction determination.

We face a crime that is connected with the defendant's military duties and a flouting of military authority as the allegations that are to give or deny military jurisdiction over this case. While it is true that these two facts, if proved, could give jurisdiction, it is much more likely that they will not bear up under close examination of the facts of this case.

Defendant, PATRICK J. BLAKE, on the basis of this motion, all evidence before and to come before this Court-Martial, and the arguements (sic) thereon, requests that all charges be dismissed which are now pend-

ing before this Court-Martial against him for the reason that this Court-Martial lacks jurisdiction to try this matter.

Respectfully Submitted;

/s/THOMAS F. MILES
THOMAS F. MILES,
Attorney for Defendant,
PATRICK J. BLAKE

### APPENDIX B

#### Special Findings

On 16 November 1977, the accused made a motion to dismiss charges of sale and possession of marijuana for lack of military jurisdiction over the alleged offenses. Evidence on the motion was received by the court from both the government and the defense, and argument presented by both sides.

In response to the written request by the defense for special findings (See Attachment 1) the court finds as follows:

1. That the possession and sale of marijuana by the accused occurred in the parking lot at a restaurant located approximately two hundred yards outside the main gate to Marine Corps Air Station, El Toro, and that this is a factor to be considered in determining service connection.

2. That the connection between the offense and the military duties of the accused was negligible, limited to the fact that the accused and the buyer of the drugs initially came into contact with each other when assigned to the same unit overseas.

3. That there was a flouting of military authority. The plans for the sale of the drugs were formulated aboard the Air Station during two encounters at the Enlisted Club between the accused and the informer, Corporal [R], and the drug deal was consummated just outside the base so as to avoid detection by military authorities of this violation of U.S. Naval (sic) Regulations.

4. That the offenses in this case are traditionally prosecuted before military courts. The informant who purchased the drugs was a Marine on active duty, the arrangements for the drug sale were conceived and made at the Enlisted Club located on the Air Station, and the crime was detected as a result of undercover activity by a Marine informant, conducted aboard the base at the direction of the Naval Investigative Service. The actual sale of the drugs took place at a restaurant frequented primarily by Marines, and was so close to the military installation that NIS agents were able to observe the sale from positions located aboard the Air Station. The accused did not commit the offenses while blended into the general civilian populace, and the military status of the parties involved, coupled with the situs of the criminal activity, gave the military community the overriding interest in the offenses committed by the accused.

/s/CLINTON L. HUBBARD
CLINTON L. HUBBARD
Captain, USMCR
Military Judge