UNITED STATES

v.

Captain Robert N. CORONADO, 456–72–9207 FV United States Air Force.

ACM 22665.

U. S. Air Force Court of Military Review.

Sentence Adjudged 15 Oct. 1979.

Decided 3 April 1981.

Mahoney, J., concurred in result and filed opinion.

Miller, J., concurred in result and filed opinion.

Appellate Counsel for the Accused: Mr. Mark L. Waple and Mr. H. Terry Hutchens, Fayetteville, North Carolina. Colonel Larry G. Stephens, Colonel George R. Stevens, Captain Douglas H. Kohrt and Captain Patrick A. Tucker, USAFR.

Appellate Counsel for the United States: Colonel James P. Porter and Captain George D. Cato.

Before ARROWOOD, MAHONEY and MILLER, Appellate Military Judges.

## DECISION

ARROWOOD, Senior Judge:

In trial by general court-martial the accused was convicted, contrary to his pleas, of conduct unbecoming an officer and a gentleman by performing acts of sodomy on an enlisted man, a violation of Article 133, Uniform Code of Military Justice, 10 U.S.C. § 933. He was sentenced to dismissal from the service.

The accused asserts that the military lacked subject matter jurisdiction over the offense since it occurred off the military installation. After careful analysis of all the facts, we weigh the military interest against that of the civilian community and conclude that jurisdiction was properly exercised.

Specialist Fourth Class Heaton, a nineteen year old cook and paratrooper stationed with the 82nd Airborn Division at Fort Bragg, North Carolina, was hitchhiking from his girl friend's home to his barracks. He was picked up by the accused at approximately 2100 hours. The accused told him he was going to Pope Air Force Base and would drop him off at Fort Bragg on the way. He then asked Heaton if he would mind going by the accused's apartment to feed his dog. Heaton agreed. They reached the apartment around 2200 hours, fed the dog and had a few drinks.

Because of the "nice things" in the apartment, Heaton questioned the accused as to his rank. When the accused told Heaton he was a Captain in the Air Force, Heaton began to call him "sir", but accused requested that he call him Bob. Before midnight they left the apartment and returned with more dog food. After several more drinks and a dice game, they again left the apartment and went to a "gay" bar. The bar was suggested by the accused, and Heaton did not know it was "gay" until he went inside and saw men dancing together. After dancing, Heaton became ill, so he and the accused left the club and returned to the apartment. In an effort to overcome his illness and sober up, Heaton took a shower.

Heaton claims that accused then forced him to commit homosexual acts. He was unable to ward off the accused's advances because he was drunk.* After the acts they both slept. They awoke at 0600 hours, dressed, and the accused drove Heaton back to his barracks. He arrived at the barracks too late to meet his scheduled duty formation. When questioned about his tardiness, he told of the incident and was taken to civilian authorities where he made a complaint against the accused.

The local district attorney testified that he had intended to prosecute the accused for forcible sodomy under North Carolina law, but when Heaton did not appear to testify on several occasions, he discussed the case with the investigating officers and finding they had doubts as to the validity of Heaton's story, he dismissed the charges.

---

* In a voluntary pretrial statement the accused admitted the acts of sodomy, but claimed they were consensual. By appropriate exceptions and substitutions, the court convicted the accused of consensual sodomy.

It was his policy to prosecute forcible sodomy in that jurisdiction, but even though consensual sodomy was in violation of statute, he normally did not prosecute that offense due to the heavy work load.

The accused's written statement in support of his earlier request for administrative discharge was admitted into evidence. It set out examples of the lack of respect that had been shown him and detailed his ineffectiveness as an officer which had resulted when fellow members of the military learned of his misconduct.

In *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), the Supreme Court required there be a "service connection" established before the military was permitted to exercise court-martial jurisdiction over its members. Later in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), the Court emphasized that an *ad hoc* approach to each case was necessary when court-martial jurisdiction was challenged and listed twelve factors (*Relford* factors) which would be considered in resolving the issue. In *Schlesinger v. Councilman*, 420 U.S. 738, 760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975), the Court stated that:

[The issue of service connection] turns in a major part on gauging the impact of an offense on military discipline, and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offenses have occurred.

The Court of Military Appeals made it clear in *United States v. Moore*, 1 M.J. 448 (C.M.A.1976), that a "detailed, thorough analysis" of all the jurisdictional criteria and the weighing of the military's interest against that of the civilian society as enunciated in *Relford* and *Councilman* is necessary to resolve the service connection issue in all cases tried by court-martial. *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980); *United States v. Alef*, 3 M.J. 414 (C.M.A. 1977); *United States v. Hedlund*, 3 M.J. 162 (C.M.A.1976); *United States v. McCarthy*, 2 M.J. 26 (C.M.A.1976).

Applying the twelve *Relford* factors in analysis of the facts in this case we find:

1. The accused was properly absent from the base. In this instance he took his rank, prestige and authority with him when he departed the installation. This was especially true in his relationship with other service members.

2. The crime was committed away from the base, but at the accused's quarters.

3. The crime was committed at a place not under military control.

4. The crime was not committed in an occupied zone or foreign country.

5. Drawing a line between hostilities and peacetime is not meaningful in defining the permissible extent of the war powers. *See United States v. Trottier, supra.* The offense in question has a definite effect on the unit's moral, efficiency and readiness to perform its military mission. The offense has resulted in the reputation and integrity of one of its officers being questioned and his ability to lead being impaired.

6. The commission of the offense adversely affected the accused's ability to perform his assigned duties as an officer. It resulted in total ineffectiveness and then removal from his assigned duties. His continuous obligation and duty to uphold the responsibilities as an officer were also breached. That breach occurred in the presence of an enlisted man who was in awe of the accused's rank and the possessions that the rank provided him. In both instances the act had an enormous impact on his personal standing as an officer and his ability to carry out his duties.

7. The victim's duty performance was also affected. The accused was aware that the victim was scheduled for duty the following morning. As a result of the offense, the victim was rendered unable to perform his scheduled duty, thus rendering him nonproductive to the United States Army.

8. Civilian courts were available to try the offense of sodomy. However, the accused is charged with disgracing his position as an officer by committing sodomy, and that offense is not cognizable in civilian courts. Here the civilian prosecutor's office demonstrated little concern for what it believed to be consensual sodomy. Viewed in its civilian setting the offense may not appear serious, but when military significance is considered and charged, the service's interest in its prosecution is clearly paramount and can only be vindicated in trial by court-martial.

9. The crime constitutes a direct flouting of military authority. Both the accused and the victim were aware of and clearly understood each other's status as a service member and their respective ranks. The accused's conduct in openly condoning and encouraging an unlawful act with an enlisted man was in total disregard of his position of authority as an officer.

10. The offense poses a threat to both Pope Air Force Base and Fort Bragg. The ability of both the accused and his victim to perform duties on their respective installations was affected by the offense. The accused's entire unit was affected as his acts adversely compromised the morale and discipline of his co-workers and required that he be removed from his normal nursing duties.

11. There is no violation of military property.

12. While forcible sodomy, the underlying offense, was traditionally prosecuted in the available civilian court, consensual sodomy is not usually prosecuted because of work load. Here, however, the accused is charged with more than sodomy, he is charged with a violation of Article 133, Code, *supra*, conduct unbecoming an officer and a gentleman. In civilian life there is no legal sanction—civil or criminal—for failure to behave as an officer and a gentleman. Such sanction may be enforced against a commissioned officer only by court-martial.

In discussing Article 133, Code, *supra* in *Parker v. Levy*, 417 U.S. 733, 753, 94 S.Ct. 2547, 2560, 41 L.Ed.2d 439 (1974), the Court defined the crime the Article creates as follows:

> To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality, or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.

The crime committed by the accused in this case has that double significance. Accordingly, the military interest could not be adequately vindicated in the civilian court.

Weighing all the factors discussed above, we find that with the exception of 2, 3, 4 and 11, they weigh heavily in favor of trial by court-martial, especially in relation to the deleterious effect of this offense upon military discipline and effectiveness. We conclude from this analysis that the military interest is distinct from and far greater than that of the civilian society. Accordingly, we find the military properly exercised jurisdiction over the accused for this offense.

The five remaining assignments of error address issues which were previously asserted and litigated at trial. The military judge correctly decided each issue adversely to the accused.

The findings of guilty and the sentence are

AFFIRMED.

MAHONEY, Judge (concurring in result):

I accept the rationale of the lead opinion as resolving this case within the framework of existing precedent on the exercise of court-martial jurisdiction.[1] However, I find

---

1. I also find frivolous the defense contention at trial and on this review that Article 133, Uniform Code of Military Justice, as applied here, is void for vagueness. Whether by force or

such tortuous analysis unnecessary for three reasons: (1) the only punishment imposed upon the accused was a severance of his military status; (2) there is no geographic limitation on the exercise of court-martial jurisdiction over the misconduct of commissioned officers under Article 133 of the Uniform Code of Military Justice;[2] and (3) in my view, *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), was improvidently decided.[3]

MILLER, Judge, (concurring in result).

While I, too, believe this case should be affirmed, my rationale for this decision moots the issue upon which the opinion of the Court is based. I depart from the lead opinion, when it states, "in *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), the (Supreme) Court emphasized that an *ad hoc* approach to each

case was necessary when court-martial jurisdiction was challenged and listed twelve factors (*Relford* factors) which would be considered in resolving the issue." While I recognize this assertion represents a widely shared interpretation of *Relford*,[1] I believe it is an improper one.

A careful reading of *Relford* reveals that the Court there, was primarily concerned with settling speculation[2] as to the breadth of its earlier ruling in *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), by emphasizing the limits of that case's scope[3] and expounding on its proper application.[4]

With respect to scope, the Court clearly emphasized the fact that *O'Callahan*, had no applicability to "purely military offenses."[5]

It did so, first by noting that implicit in Justice Douglas' consideration of each of

---

consent, the commission of anal or oral sodomy upon the person of a male enlisted member by a male commissioned officer cannot but be reasonably understood by all as "conduct unbecoming an officer and a gentleman." *See, Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); Nelson, *Conduct Expected of an Officer and a Gentleman: Ambiguity*, 12 A.F. JAG L.Rev. 124 (1970).

**2.** *O'Callahan v. Parker*, 395 U.S. 258, 270, 89 S.Ct. 1683, 1689, 23 L.Ed.2d 291, note 14 (1969); *Parker v. Levy, supra*, 749, 94 S.Ct. at 2558.

**3.** See my dissenting opinion, note 32, in *United States v. Anderson*, 10 M.J. 803 (A.F.C.M.R. 1981). See also, *Gosa v. Mayden*, 413 U.S. 665, 692, 93 S.Ct. 2926, 2942, 37 L.Ed.2d 873 (1972) (Rehnquist, J. concurring).

**1.** This interpretation has apparently grown from the often reiterated language of the Court of Military Appeals in *United States v. Moore*, 1 M.J. 448 (C.M.A.1976):

What *Relford* makes clear is the need for a detailed, thorough analysis of the jurisdictional criteria enunciated to resolve the service-connection issue in *all* cases tried by court-martial. A more simplistic formula, while perhaps desirable, was not deemed constitutionally appropriate by the Supreme Court. It no longer is within our providence to formulate such a test. [Emphasis added.] *Id.* at 450. For reiterations of this language see: *United States v. Hedlund*, 2 M.J. 11, 14 (C.M.A.1976), *United States v. McCarthy*, 2 M.J. 26, 28 (C.M.A.1976), and *United States v. Alef*, 3 M.J. 414, 416 (C.M.A.1977).

**2.** Note the 49 citations to scholarly comment on *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), and 68 citations to cases referencing it contained in the first 8 footnotes of *Relford v. Commandant*, 401 U.S. 355, 356–59, 91 S.Ct. 649, 650–52, 28 L.Ed.2d 102 (1971).

**3.** "Certiorari was granted 'limited to retroactivity and scope of *O'Callahan v. Parker* * * *', *Relford v. Commandant, U. S. Disciplinary Barracks, Ft. Leavenworth, Kan.*, 397 U.S. 934, 90 S.Ct. 958, 25 L.Ed.2d 114 (1970) . . .", *Relford, supra* at 360–361, 91 S.Ct. at 652–53. "... *O'Callahan's* retrospectivity, need not be decided," *Relford, supra*, at 370, 91 S.Ct. at 657.

**4.** "We thus do not reconsider *O'Callahan*. Our task here concerns only its application." *Relford, supra*, at 361, 91 S.Ct. at 653.

**5.** I would define "purely military offenses" as those not traditionally prosecuted in civilian courts because they have no counterpart in civilian law. See, item 12 of the seriatum listing of the jurisdictional factors emphasized in the holding of *O'Callahan, Relford, supra*, at 366, 91 S.Ct. at 655–56, and factor (h) *Relford, supra*, at 369–370, 91 S.Ct. at 657–58. This definition would include Articles 83 through 117, 10 U.S.C. §§ 883 through 917, (excluding Articles 111 and 116), portions of Articles 123, 128, and 132, 10 U.S.C. §§ 923, 928, and 932 all of Article 133, and, in light of recent precedent, portions of Article 134, 10 U.S.C. § 934 (precedents, which, as will be noted later, are arguably improvident).

the eleven jurisdictional factors on which *O'Callahan* was decided, was the fact that the offenses committed were among those traditionally prosecuted in civilian court. *Relford, supra*, at 366. In other words, had the offenses been "purely military" ones, court-martial would have been appropriate and permissible, without reference to the *O'Callahan* jurisdictional factors.

Later, in contrasting the pertinent factual elements of *O'Callahan* and *Relford*, the Court implicitly recognized that Article I, § 8, cl. 14 of the Constitution vested in Congress the power to create "purely military offenses" to be dealt with exclusively by military courts. It did so by opining that:

> The language of Article I, § 8, Cl. 14 vesting in Congress the power "to make rules for the Government and Regulation of the land and naval forces" means in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civilian authorities.

*Relford, supra*, at 368, 91 S.Ct. at 656, V(d), while at the same time, and in the same context, advising of its concern that it would be a:

> ... misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law.

*Relford, supra*, at 369, 91 S.Ct. at 657, V(h).

*O'Callahan*, itself, while perhaps implicitly recognizing the inapplicability of its holding to "purely military offenses," failed to explicitly mention them at all.

Turning now to a consideration of the Court's comments in *Relford, supra*, on the proper application of the *O'Callahan, supra*,

ruling, I also find them to be inconsistent with the lead opinion's generally accepted interpretation of the Court's holding. Justice Blackmun, in fact, seemed to go to great lengths to point out specifically that the "ad hoc" nature of *O'Callahan's* holding was not meant to require that separate jurisdictional findings based on the 11 *O'Callahan* factors be made at every future court-martial for other than purely military offenses. Rather, he indicated that as cases were presented to them, appellate courts were to carve out "areas" of similar offenses, and determine on an "ad hoc" basis whether all such future offenses were or were not the proper subject of court-martial jurisdiction.[6] In the words of the Court:

> We recognize that any ad hoc approach leaves outer boundaries undetermined. *O'Callahan* marks an area, perhaps not the limit, for the concern of the civil courts and where the military may not enter. The case today marks an area, perhaps not the limit, where the court-martial is appropriate and permissible. What lies between is for decision at another time.

*Relford, supra*, VI, at 370, 91 S.Ct. at 657.[7]

Consequently, even assuming, *arguendo*, that the offense here was not a "purely military" one, my brother, Senior Judge Arrowood, rather than limiting his application of the 11 *O'Callahan* factors enumerated by *Relford* to the precise facts of this particular case, should have followed the dictates of *Relford*, by carving out and defining an area of cases, to which the same jurisdictional considerations would also have applied. By so doing, he would have provided appropriate guidance for future

---

**6.** The Court of Military Appeals appears to have recognized the validity of this interpretation in *United States v. Trottier*, 9 M.J. 337 (C.M.A.1980), by establishing "most drug offenses" as an area where courts-martial are appropriate and permissible without a consideration of all the other *O'Callahan* jurisdictional factors.

**7.** The area "carved" out by *O'Callahan*, as lacking jurisdiction consisted of offenses triable by

a civilian court, that occurred off base, on American territory, while the offender was on leave and not in uniform, *Relford, supra* at 357 and 365, 91 S.Ct. at 651 and 655. The area "carved" out by *Relford* as having jurisdiction were offenses committed within or at the geographical boundary of a military post and violative of the security of a person or of property thereon, *Relford, supra*, at 370, 91 S.Ct. at 657.

cases of a similar nature and thereby promoted the interests of judicial economy.

Based on my interpretation of the aforestated law, however, application of *O'Callahan/Relford* criteria to the facts of this case is unnecessary. I conclude that the offence before us, not being of a kind traditionally prosecuted in civilian courts and being without counterpart in civilian law, is a "purely military offense" over which military courts always have jurisdiction.

Simply stated, the jurisdictional holdings of *O'Callahan* and *Relford*, are inapplicable to the offense here and need not be applied.

Finally, before closing this opinion, I feel compelled to make additional comment on the propriety of classifying Article 133 offenses, as "purely military" ones, lest fault be found with my logic: because though the offense here was one of "conduct unbecoming an officer and a gentleman," the conduct that generated the charge was an act of "sodomy," an offense *ordinarily triable* in civilian courts.[8]

Wherever committed, conduct of an officer which undermines his integrity to the degree implied in an Article 133 violation destroys or seriously impugns respect for the officer's standing as an individual, acceptance of his reliability, and obedience to his orders. This is inconsistent with a continued position of authority and warrants creation of an offense distinct from that which might otherwise define the misconduct and justifies the punishment of dismissal, formerly required and still traditional for this distinct transgression.

The framers of the 1950 Code recognized this reality as had the framers of all the antecedent Articles of War adopted by Congress, and all antecedent codes for the Articles of War dating back to at least 1765, upon which our original Articles of War were based.[9] That is why after laying out 52 punitive articles, enumerating both "purely military" and "civilian type" crimes, the 1950 Congress included Articles 133 and 134. By doing so they assured themselves of accomplishing the distinctively overriding purpose of a separate, military, justice system; to wit: criminalizing all conduct directly denigrating to the unquestioning obedience of superior authority that stands at the heart of effective fighting forces.

The Supreme Court in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 291 (1974), while noting that the scope of these two Articles had been somewhat restricted by limiting decisions of the Court of Military Appeals, explicitly recognized their legitimacy and "purely military" nature.[10] Insofar as offenses charged under these articles are charged because they constitute conduct unbecoming an officer and gentleman or are prejudicial to good order and discipline, I am convinced they always constitute "purely military" offenses over which the military has exclusive jurisdiction.

Based on this analysis, it is clear to me that a male commissioned officer, who engages in acts of sodomy with, and upon, a male enlisted person, engages in conduct well within the currently recognized scope of conduct condemned as "unbecoming an officer and gentleman:" i. e., the conduct

---

8.  Such an argument could be supported by the fact that some Article 134 offenses, even though, for conduct "prejudicial of good order and discipline in the armed forces, . . . (or) of a nature to bring discredit upon the armed forces" have, when generated by offenses ordinarily triable in civilian courts, been found to be other than purely military offenses, *See O'Callahan,* and note 4, *supra.*

9.  For a detailed review of the complete recorded history of Articles 133 and 134, see *Parker v.*

*Levy,* 417 U.S. 733, 743–749, 94 S.Ct. 2547, 2555–58, 41 L.Ed.2d 291 (1974).

10. *Parker v. Levy, supra,* offers a brilliant and detailed analysis of the legislative history and purposes of these Articles, not contained herein. While the primary issues before the Court were "vagueness" and "overbreadth," there can be no doubt that the Court also recognized their "purely military" nature, and their importance to maintaining an effective fighting force.

has a denigrating effect upon the integrity and honor which subordinates legitimately expect of a leader they are required to obey.

I refrain from joining my brother, Judge Mahoney's opinion, as to the providency of *O'Callahan* because, on the facts of this case I find it unnecessary to reach that issue.